No. 16-1296

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

### ADIDAS AG

*Petitioner-Appellee*

v.

### CHRISTIAN FAITH FELLOWSHIP CHURCH

*Respondent-Appellant*

---

**Appeal from the Trademark Trial and Appeal Board (Cancellation No. 92053314)**

---

### BRIEF AND APPENDIX OF CHRISTIAN FAITH FELLOWSHIP CHURCH

---

**December 21, 2015**

**Richard W. Young
E. King Poor
QUARLES & BRADY, LLP
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654
(312) 715-5000**

*Attorneys for Respondent-Appellant*

# CERTIFICATE OF INTEREST

Counsel for Christian Faith Fellowship Church hereby certifies the following:

1) The full name of every party or amicus represented by me is:

   Christian Faith Fellowship Church

2) There are no other real parties in interest represented by me.

3) Christian Faith Fellowship Church certifies that it has no corporate parent and there are no publicly held corporations that own 10% or more of its stock.

4) The names of all of the law firms and partners or associates that appeared for the Petitioners in the Trademark Trial and Appeal Board or are expected to appear in this Court are:

   a. Richard W. Young, and E. King Poor, of Quarles & Brady, LLP, 300 North LaSalle Street, Suite 4000, Chicago, Illinois 60654;

   b. John E. Conour, formerly of Quarles & Brady, LLP, 300 North LaSalle Street, Suite 4000, Chicago, Illinois 60654.

December 21, 2015.                    */s/Richard W. Young*
                                        Richard W. Young

                                     *Attorney of Record for Respondent-Appellant*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. I

TABLE OF AUTHORITIES ................................................................ III

STATEMENT OF RELATED CASES .................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 2

STATEMENT OF THE ISSUE ............................................................ 3

STATEMENT OF THE CASE ............................................................. 4

STATEMENT OF THE FACTS ........................................................... 5

SUMMARY OF ARGUMENT ............................................................ 8

ARGUMENT ................................................................................... 10

    A.  The Board's decision should be reviewed *de novo*. ..................................... 10

    B.  "Use in commerce" under the Lanham Act includes any use having an affect on interstate commerce; there is no *de minimis* exception ............. 11

    C.  The Church used its mark in Commerce. ....................................... 15

    D.  The Board ignored Supreme Court and this Court's precedent in imposing a *de minimis* exception ................................................... 16

CONCLUSION .................................................................................. 21

# TABLE OF AUTHORITIES

Cases

*In re Cook, United, Inc.,* 188 U.S.P.Q. 284 (T.T.A.B. 1975) .................................. 16

*In re Gastown, Inc.,* 326 F.2d 780 (C.C.P.A. 1964) .............................................. 13

*Gonzales v. Raich,* 545 U.S. 1 (2005) ................................................... 10, 12, 13, 16

*Heart of Atlanta Motel, Inc. v. U.S.,* 379 U.S. 241 (1964) .................................... 16

*Hewlett-Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261 (Fed. Cir. 2002) ...... 10

*Katzenbach v. McClung,* 319 U.S. 294 (1964) ................................................. 12, 17

*Larry Harmon Pictures Corp. v. The Williams Restaurant Corp.,* 929 F.2d 662
................................................................................................................... Passim

*Perez v. United States,* 402 U.S. 146 (1971) ........................................................ 13

*Application of Silenus Wines,* 557 F.2d 806 (C.C.P.A. 1977) .............. 11, 14, 18, 19

*In re The Bagel Factory, Inc.,* 183 U.S.P.Q. 553 (T.T.A.B. 1974) ........................ 16

*Wickard v. Filburn,* 317 U.S. 111 (1942) .............................................................. 12

Statutes

15 U.S.C. §1051(a) .................................................................................................. 11

15 U.S.C. §1067 ........................................................................................................ 2

15 U.S.C. §1071(a)(1) ............................................................................................... 2

15 U.S.C. §1071(a)(2) ............................................................................................... 2

15 U.S.C. §1127 ............................................................................................ 8, 11, 18

28 U.S.C. §1295(a)(4)(B) .......................................................................................... 2

Rules

Fed. Cir. R. 30 .......................................................................................................... 4

Fed. R. App. P. 30 .................................................................................................... 4

Regulations

37 C.F.R. § 2.145(d) .................................................................................................. 2

Other Authorities

3 J. Thomas McCarthy, Trademarks and Unfair Competition (4th ed.) . 10-11, 16-17

*The "Use in Commerce" Requirement for Trademark Registration After Larry Harmon Pictures,* 32 IDEA: The Journal of Law and Technology 327..................17

Trademark Manual of Examining Procedure §901.03 (Oct. 2015).........................17

## STATEMENT OF RELATED CASES

Appellant is aware of no other appeals that have been filed from the underlying decision of the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office in Cancellation No. 92053314, or of any cases related to it.

# JURISDICTIONAL STATEMENT

The Board had jurisdiction over Cancellation No. 92053314 (the "Cancellation") under 15 U.S.C. §1067. In the Cancellation, appellee adidas AG claimed it would be damaged by the continued registration of two trademarks owned by the appellant Christian Faith Fellowship Church. adidas claimed, among other things, that the Church's registrations were invalid because the marks had not been used in interstate commerce.

This Court has jurisdiction under Lanham Act Section 21(a)(1), 15 U.S.C. §1071(a)(1), and 28 U.S.C. §1295(a)(4)(B). The Board's final decision and order granting adidas' petition to cancel the Church's registrations was issued on September 14, 2015. The Church timely filed this appeal on October 29, 2015 within two months of the Board's order as required by 15 U.S.C. §1071(a)(2) and 37 C.F.R. § 2.145(d). This appeal is from a final order disposing of all claims as to all parties. 28 U.S.C. §1295(a)(4)(B).

## STATEMENT OF THE ISSUSE

The Church is based in Zion, Illinois, near the Wisconsin state line. The record is undisputed that the Church sold two hats bearing the registered trademarks to a customer residing in Wisconsin. The appeal presents this question:

Does the sale of even a small amount of merchandise to an out-of-state customer qualify as a "use in commerce" under the Lanham Act?

## STATEMENT OF THE CASE

This case arises from a trademark cancellation proceeding before the Board. *adidas AG v. Christian Faith Fellowship Church*, Cancellation No. 9205331, 2015 WL 5882313 (T.T.A.B. Sept. 14, 2015). Appendix (App.) at 1-17.[1]  The Church, located in Zion, Illinois, is a non-denominational place of worship situated less than five miles from the Wisconsin-Illinois state line. Its 1,200-member congregation is made up of residents of multiple states, chief among them Wisconsin and Illinois. adidas is a German multinational corporation that specializes in the design and manufacture of athletic shoes, clothing, and accessories. The company generated over $14.5 billion in revenue in 2014.

The Church owns registrations for both its ADD A ZERO word and design trademarks (U.S. Reg. Nos. 3,173,207 and 3,173,208). adidas petitioned to cancel the Church's registrations for the ADD A ZERO marks on various grounds, among them, that the Church's registrations were void because the Church had not used the marks in commerce before applying to register them under Section 1(a) of the Lanham Act.

The Board granted adidas' petition, declaring that the Church's sale of goods bearing the marks to an out-of-state parishioner was "*de minimis*" and insufficient to constitute use in commerce under the Lanham Act. In particular, the Board

---

[1] The citations to the record are from the accompanying appendix filed under Fed. R. App. P. 30 and Fed. Cir. R. 30 and are abbreviated "App. __."

found that "[i]n this instance, . . . the sale of two ADD A ZERO caps at a minimal cost within the state of Illinois to Ms. Howard, who resides outside the state, does not affect commerce that Congress can regulate such that the transaction would constitute use in commerce for purposes of registration."  App. 16. The Board went on to conclude that "[t]his sale is *de minimis* and, under the circumstances shown here, is insufficient to show use that affects interstate commerce."  App. 17.

## STATEMENT OF THE FACTS

### A Wisconsin resident buys the Church's branded apparel in Illinois.

The Church has over 1,200 members (App. 62) including more than 200 residents of Wisconsin, as well as naval recruits from across the United States who are stationed at nearby Great Lakes Naval Training Center. App. 39, 47-48 and 60-61.

To meet the needs of its growing congregation, in 2005 the Church purchased land in northern Illinois for a new, larger church. App. 36.  It established a building fund to help pay for the land and the new church building. *Id.* The Church's senior pastor launched a plan to sell branded caps and shirts to raise money for the building fund. App. 37-38.  Inspired by an evangelist who visited the church, the caps and shirts were branded ADD A ZERO. *Id.* The Church, working with an apparel vendor, designed a stylized logo featuring its ADD A ZERO trademark (App. 34) and purchased a modest quantity of caps,

sweatshirts, and T-shirts with the ADD A ZERO logo to sell in the Church's

bookstore, located in the basement of the church building. App. 35, 67.

The Church began selling ADD A ZERO caps and shirts in the Church

bookstore in January 2005. App. 24, 25, 63-65. The evidence before the Board

established that the Church offered its ADD A ZERO apparel for sale to all of its

parishioners, including those traveling from out of state:

> Q.    Was Add A Zero merchandise offered for sale to these
>       parishioners who attend from out of state?
>       . . .
>
> A.    Yes. It's offered to anyone that attends.
>       . . .
>
> Q.    Was Add A Zero merchandise offered to your parishioners whether
>       they attend from in state or out of state in 2005?
>       . . .
>
> A.    If they - the product is available. If they go to the bookstore, the
>       product is available for them to purchase.

App. 49-50.

Among the early purchasers of ADD A ZERO apparel was Charlotte

Howard, a church member from Kenosha, Wisconsin, who crossed the state line to

attend services at the Church and bought apparel to support its mission. App. 47-

61, 63-66. On February 23, 2005, Charlotte Howard purchased two ADD A ZERO

branded caps in the bookstore. *Id.* The Church promoted its ADD A ZERO caps

and shirts through in-store point of sale displays in the bookstore, a video display in the sanctuary, and verbally at its services and public events. App. 40-44.

The sale to Ms. Howard was confirmed by her personal check dated February 23, 2005 maintained in the business records of the Church.  App. 55-59, 66. The check bore her Wisconsin address. The bookstore's ADD A ZERO sales receipts for February 23, 2005 also confirmed the sale. App. 55-59, 66 Rcpt# 01625.[2]

### The Church registers its trademarks after the interstate sale.

After the sale to Ms. Howard in February 2005, the Church applied to register its ADD A ZERO marks on March 23 and March 24, 2005.  App. 30-31.

In November 2010, adidas petitioned to cancel the Church's registrations because, among other reasons, the Church's use did not satisfy the Lanham Act's requirement that a mark must be "use[d] in commerce" before it can be registered.[3] In September 2015, the Board granted adidas' petition, ruling that the Church's sale of goods bearing the mark to a Wisconsin resident prior to the filing of its

---

[2] In addition to the sale to Ms. Howard, the record also reflects a sale to Clemintina Ekong who resided at the Great Lakes Naval base. App. 52-55, 64-65. Since the record does not further identify Ms. Ekong's residence, the Church does not rely on the sale to Ekong in this appeal as it did before the Board.

[3] adidas' Petition for Cancellation also alleged that the Church abandoned its marks and that the marks failed to function as trademarks. App. 26-31.  The Board did not decide either of those issues.  App. 2-3.

applications was "*de minimis*" and "insufficient to show use that affects interstate commerce." App. 8.

## SUMMARY OF ARGUMENT

The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. §1127. Long ago, the Supreme Court made plain that Congress' ability to regulate commerce under the Commerce Clause is to be broadly construed to include activity that is purely intrastate and even that which on an individual basis may be *de minimis*. Both this Court and its predecessor have applied the Supreme Court's broad interpretation of the Commerce Clause to the Lanham Act's definition of "commerce" when analyzing the Act's threshold requirement that a trademark must be "used in commerce" to be registered. In doing so, this Court has recognized that when the Lanham Act was enacted almost 70 years ago in 1946 its language represented "an obvious change" from earlier federal trademark acts and included a "broadening of jurisdiction." *Larry Harmon Pictures Corp. v. The Williams Restaurant Corp.*, 929 F.2d 662, 664 (Fed. Cir. 1991).

In particular, this Court stated that the terms "commerce" and "use in commerce" are unambiguous expressions of Congressional intent to expand the scope of federal trademark jurisdiction to "all commerce which may lawfully be regulated by Congress." *Id.* And in its *Larry Harmon* decision, the Court expressly

rejected an argument that an applicant must establish a certain level of interstate activity before it qualifies as a "use in commerce." *Id.* at 666.

In this case, the record establishes and the Board found that the Church sold its goods bearing the marks to an out-of-state parishioner before applying to register its ADD A ZERO marks. App. 55-59, 66. Despite this and the express ruling in *Larry Harmon* that the term "use in commerce" is not to be limited to a certain level of activity, the Board dismissed the sale here as *de minimis* and insufficient to show a "use in commerce." App. 16-17.

The Board's reliance on its own *de minimis* exception is directly at odds with the *Larry Harmon* decision, not to mention Supreme Court precedent generally requiring the Commerce Clause to be construed broadly. As the court in *Larry Harmon* stated, determining whether activity triggers the Commerce Clause has never been a matter of counting the number of sales and gauging whether they reach some judicially-determined threshold. Yet in this case, under the Board's reasoning, the sale of two hats to a Wisconsin resident was too few to qualify as a "use in commerce." What would be enough? Would the Church have to sell 20 hats? Or 200? Commerce Clause jurisprudence has never been about counting hats — or the magnitude of any other activity.  In fact, the law is just the opposite. If the general regulatory statute bears some relationship to interstate activity, then

it is of "no consequence" that an individual use that is part of that process is itself *de minimis*. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005)(citations omitted).

With the Lanham Act, Congress intended to expand the reach of federal trademark regulation from earlier statutes. And it did so with unambiguous language that the term "use in commerce" represents "all the commerce which may lawfully be regulated by Congress." *Larry Harmon*, 929 F.2d at 664. With that expansive definition, that itself must be broadly construed, the federal regulation of trademarks includes all sales of merchandise that touch interstate transactions, even if the particular sales in question are small. Once it is established that Congress may lawfully regulate trademarks that may be part of interstate sales, then it does not matter if those sales number two or 200. Here, it is undisputed that some of the Church's branded merchandise was sold to an out-of-state customer. That was enough for the Church's trademarks to have been "use[d] in commerce" and entitled to the protections of the Lanham Act.

## ARGUMENT

### A.    The Board's decision should be reviewed *de novo*.

The Board's decision hinges on its interpretation of the term "used in commerce" and legal precedent interpreting it. This legal question must be reviewed *de novo* and without deference to the Board's conclusions. *Hewlett-Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 1265 (Fed. Cir. 2002). *See*

*also* 3 J. Thomas McCarthy, Trademarks and Unfair Competition, § 21:17.50 (4th ed.) (citing various cases for the proposition that this Court reviews "the board's legal conclusions, such as its interpretation of the Lanham Act . . . *de novo*" (internal citation omitted)).

**B.      "Use in commerce" under the Lanham Act includes *any* use having an affect on interstate commerce; there is no *de minimis* exception.**

The Lanham Act defines "commerce" expansively as "all commerce which may lawfully be regulated by Congress." *Id*. The Act in turn requires that a mark be "used in commerce" to be registered  (15 U.S.C. §1051(a)) and defines the term as:

> the bona fide use of a mark in the ordinary course of trade … (1) on goods when -- (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto …  and (B) the goods are sold or transported in commerce.

15 U.S.C. §1127.  As this Court's predecessor recognized in *Application of Silenus Wines*, 557 F.2d 806, 809 (C.C.P.A. 1977), the Lanham Act's language describing "commerce" as "all commerce which may lawfully be regulated by Congress" represented an "obvious change" from the earlier trademark acts and was "mindful of the broad scope of Congressional regulatory powers which the Supreme Court has sanctioned." Again in  *Larry Harmon*, 929 F.2d at 664, this Court cited *Silenus Wines* in recognizing that the Lanham Act represented an "obvious change" from

earlier trademark acts and that Congress intended to exercise the "full extent of its constitutional powers."

And as to how broad those powers are, the Supreme Court has long taken an expansive view of the types of activities Congress may lawfully regulate under its commerce power. For example, in the well-known decision of *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942), the Court held that Congress had the authority to regulate a farmer's production of wheat for his own personal use. The Court explained that it was the "class of activity," and not whether an individual use in a particular case may be "trivial," that defines the outer reaches of the Commerce Clause:

> Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic "class of activities" that have a substantial effect on interstate commerce. … The fact that Filburn's own impact on the market was "trivial by itself" was not a sufficient reason for removing him from the scope of federal regulation.

Again, in *Katzenbach*, the Court relied on *Wickard* to hold that intrastate sales of food which had formerly traveled in interstate commerce sufficiently affected interstate commerce to allow federal regulation. *Katzenbach v. McClung*, 379 U.S. 294 (1964). And more recently, in *Gonzales,* the Court relied on *Wickard* to hold that the commerce clause empowers Congress to regulate the intrastate, noncommercial cultivation and possession of cannabis for personal

medical purposes: "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." 545 U.S. at 23, *quoting Perez v. United States*, 402 U.S. 146 (1971). These cases and numerous other decisions establish the broad range of Congress' power to regulate commerce. *Gonzales*, 545 U.S. at 18.

Moreover, *Gonzales* made plain that when it comes to a general regulatory statute that is substantially related to commerce, as is the Lanham Act, there is no *de minimis* exception. The Court emphasized in *Gonzales* that even though the challenged activity was two individuals' personal cultivation and possession of cannabis**, "the *de minimis* character of individual instances arising under that statute is of no consequence."** *Id.* (emphasis added, citations omitted). In other words, the relevant inquiry is not the extent of individual use, but whether the conduct falls into a class of activities that is sufficient in the aggregate to affect interstate commerce such that Congress can regulate it.

Both this Court and its predecessor have adopted the Supreme Court's broad interpretation of "commerce," and applied it to the Lanham Act. For example, the Court of Customs and Patent Appeals held that automotive services provided in a single state to persons travelling across state lines affected interstate commerce and were therefore sold "in commerce." *In re Gastown, Inc.*, 326 F.2d 780 (C.C.P.A. 1964). Later, in *Silenus Wines*, the court considered the intrastate sale of wine

imported from France and built upon its *Gastown* decision to hold that the Lanham Act's definition of "commerce" "includes intrastate commerce when such commerce directly affects other commerce which Congress may lawfully regulate. *Gastown's* rationale is not limited to services." 557 F.2d at 808. And it stated that "goods are 'sold or transported in commerce' when their sale or transportation directly affects interstate or other commerce which may lawfully be regulated by Congress." *Id.*

Again, in *Larry Harmon*, this Court held that a single-location restaurant serving customers travelling across state lines constitutes use in commerce under the Lanham Act. 929 F.2d at 666. Because customers crossed state lines to purchase the restaurant services, the services were offered in interstate commerce, even though the mark's owner did not itself cross state lines to provide the services. Of particular importance, the court refused to adopt a set minimum of interstate customers or activity necessary to satisfy the "use in commerce" requirement, stating that "we must reject" any "non-statutory limitations" on what constitutes commerce—such as the location of an interstate highway, the percentage of meals furnished to interstate travelers, or out-of-state advertising . *Id*. In addition, the court did not require that the trademark owner have actually shipped goods across state lines. Rather, the court relied on the fact that both *Gastown* and *Silenus Wines* "unequivocally held that the definition of commerce in

14

the Lanham Act means *exactly what the statute says*, i.e., 'all commerce which may lawfully be regulated by Congress.'" *Id.* (emphasis added).

Therefore, the term "use in commerce," when construed broadly as it must under Supreme Court precedent, means all commerce that may be regulated by Congress, including entirely intrastate sales of goods that affect interstate commerce. And neither the Supreme Court nor this Court have imposed any sort of arbitrary, non-statutory, judge-made minimum thresholds or any *de minimis* exception to establish a "use in commerce."

## C.     The Church used its mark in Commerce.

Just as customers travelled across state lines to the restaurant in the *Larry Harmon* case, parishioners travelled across state lines to the Church in Zion, Illinois. App. 48, 62. It is undisputed that the Church offered its ADD A ZERO apparel for sale to all of its parishioners, including those traveling from out of state.

The record also established that Ms. Howard, residing in Kenosha, Wisconsin, bought two ADD A ZERO caps on February 23, 2005, one month before the filing of the ADD A ZERO trademark applications. App. 66.  The evidence before the Board thus showed beyond dispute that ADD A ZERO apparel was offered and sold to out-of-state parishioners traveling across state lines to the Church *before* the filing of the trademark applications. And as shown above, even

15

only one such sale was sufficient to satisfy the Lanham Act's "use in commerce" requirement. *See Gonzales*, 545 U.S. at 18 ("the *de minimis* character of individual instances arising under that statute is of no consequence").

## D. The Board ignored Supreme Court and this Court's precedent in imposing a *de minimis* exception.

Here, the Board relied on two of its own decisions that have been rejected by both this Court and its predecessor. The Board cited *In re Cook* for the proposition that an "applicant who sells a product exclusively within a single state cannot satisfy the 'use in commerce' requirement by relying on the fact that purchasers of the product may come from another state and/or transport the product across state lines." *In re Cook, United, Inc.*, 188 U.S.P.Q. 284, 287 (T.T.A.B. 1975). It also relied on *In re The Bagel Factory* for the proposition that "sales entirely within Michigan cannot support federal registration even when a customer transported the product to Ohio after sale." *In re The Bagel Factory, Inc.*, 183 U.S.P.Q. 553, 554 (T.T.A.B. 1974). These Board decisions, rendered more than 40 years ago, have been roundly criticized as flouting such Supreme Court precedent as *Katzenbach* and *Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241 (1964).

One such criticism comes from a leading trademark commentator, *3 J. Thomas McCarthy,* Trademarks and Unfair Competition. There, Professor McCarthy maintains that *Bagel Factory* is wrongly decided because it required "that the goods bearing the mark [must] have been sold or shipped across a state

16

line under the authority of the trademark owner." He continues, "If Congress has the power to control racial discrimination at local establishments that either (1) serve interstate travelers or (2) sell products which come from out of state, then Congress has equal power to control and register marks used to identify the goods sold by such establishments." §§19:118 n.28 and 19:123 (4th ed.).

Another commentator analyzed and compared application of the "commerce" standard by the Patent and Trademark Office against interpretation of the Commerce Clause by this Court and its predecessor and concluded by criticizing the Board for misconstruing the Lanham Act. Peter C. Christen and Teresa C. Tucker, *The "Use in Commerce" Requirement for Trademark Registration After Larry Harmon Pictures*, 32 IDEA: The Journal of Law and Technology 327, 341 ("not only is the PTO's perspective [as stated in *In re Cook*] no longer appropriate nor correct, it is no longer the law."). *See also Katzenbach*, 379 U.S. at 299-301 (finding that a single restaurant that served no out of state customers dealt in interstate commerce).[4]

---

[4] Notably, the Patent and Trademark Office's own Trademark Manual of Examining Procedure (TMEP) does not cite either *In re Cook* or *In re The Bagel Factory* in guiding trademark examining attorneys about how to assess "use in commerce." Instead, the TMEP cites the three cases relied upon by the Church here - *Gastown, Silenus Wines* and *Larry Harmon*. TMEP §901.03 (Oct. 2015).

In fact, just two years after the *Cook* decision, this Court's predecessor, in *Silenus Wines*, admonished the Board for its narrow interpretation of "use in commerce":

> On its face, the Lanham Act provides a clear and unambiguous definition of federal trademark jurisdiction in terms of general Constitutional law as interpreted by the Supreme Court. . . . However, the Patent and Trademark Office has historically taken the position that statements made at the hearings on the Lanham Act contradict and overshadow this statutory definition of commerce. . . . [The PTO] stated that "commerce" did not cover intrastate transactions regardless of affect on interstate and foreign commerce. . . . We reject the PTO position.

557 F.2d at 810-811 (emphasis added).

Moreover, in *Silenus Wines,* the Court expressly rejected the Board's conclusion in *Cook* that *Gastown* must be limited to services. *Id.* at 808. The Court then explained why "use in commerce" under the Lanham Act must be broadly interpreted:

> In the Lanham Act, Congress set out what appears to be an unambiguous statement of the scope of federal trademark jurisdiction, namely, "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127 (1976). This language represents an obvious change from the phrasing of the former trademark acts, which phrasing expressly limited trademark jurisdiction to interstate and foreign commerce and commerce with Indians. *The change clearly involves a broadening of jurisdiction*. In making the change, *Congress is presumed to be mindful of the broad scope of Congressional*

> *regulatory powers which the Supreme Court has sanctioned . . . .*

*Id*. at 809-10 (emphasis added). The decision in *Silenus Wines* is a clear rejection of the Board's reasoning in *Cook* and *Bagel Factory*.

Moreover, this Court adopted the reasoning in *Silenus Wines* in *Larry Harmon*, ruling that "the definition of commerce in the Lanham Act means exactly what the statute says, *i.e.* 'all commerce which may lawfully be regulated by Congress.'" 929 F.2d at 666.

While the Board referenced *Gastown, Silenus Wines* and *Larry Harmon* in its decision here, it still followed its own discredited reasoning in *Cook* and *Bagel Factory*. App. 6-8. And in doing so, the Board has overlooked longstanding authority from the Supreme Court and this Court requiring "commerce" to be construed broadly and that does not permit a *de minimis* exception.

In this case, it is undisputed that the Church offered its apparel for sale to all parishioners, including those living in Wisconsin. And neither Supreme Court precedent nor that of this Court requires a seller to *ship* a certain amount of its product across state lines to satisfy the definition of "use in commerce." If that were the rule, then in this case, if Ms. Howard had called the Church and asked that her hats be shipped to her in Wisconsin that would have qualified as "use in commerce." But because she drove to Illinois to buy them in person that is not

commerce. No court has ever drawn such a distinction, and logically such a distinction cannot stand.

If the Commerce Clause is to retain the broad meaning it has always had, then it includes cases such as this one in which an out-of-state buyer travels to the seller's point of sale. Moreover, Commerce Clause jurisprudence has never included any sort of test requiring a judicial weighing of sales volume. Indeed, this Court expressly rejected that in *Larry Harmon,* 929 F.2d at 666.  Contrary to the Board's decision here, there is no *de minimis* exception recognized by the Supreme Court or this Court. If, as in this case, the evidence demonstrates unmistakably that an out-of-state party crossed a state line to make even a single purchase, then that is sufficient to establish that the trademark was used in commerce and entitled to the protections of the Lanham Act.

## CONCLUSION

The Board's decision imposing a *de minimis* test for determining "use in commerce" under the Lanham Act should be vacated and this case remanded for consideration of adidas' other, unrelated grounds for cancellation of the Church's registrations.

Respectfully submitted this 21st day of
December, 2015.

*/s/ Richard W. Young*

Richard W. Young
E. King Poor
QUARLES & BRADY LLP
300 North  LaSalle Street, Suite 4000
Chicago, Illinois 60654

(312) 715-5000

*Attorneys for Respondent-Appellant.*

# CERTIFICATE OF SERVICE

I certify that on December 21, 2015, I served a true and correct copy of the foregoing on Angelo Notaro, counsel for Petitioner-Appellee adidas AG via ECF and email (anotaro@notaromichalos.com).

Dated: December 21, 2015.                    */s/ Richard W. Young*
                                             Richard W. Young

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32 (a)(7)

I, Richard W. Young, an attorney, certify that the Brief of Appellant (including headings, footnotes and quotations, excluding the disclosure statement, table of contents, table of citations, certificates of counsel, certificate of interest and statement of related cases) contains 3,918 words of proportionally-spaced type in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7).

*/s/ Richard W. Young*

Richard W. Young

# INDEX TO APPENDIX

Trademark Trial and Appeal Board Opinion and Order....................................App. 1

Certified List of Proceedings before the Trademark Trial and
Appeal Board ................................................................................................App. 18

ADD A ZERO U.S. Trademark Reg. No. 3,173,207 ....................................App. 24

ADD A ZERO and Design U.S. Trademark Reg. No. 3,173,208 .................App. 25

First Amended Consolidated Petition to Cancel............................................App. 26

Deposition of Craig Mason (February 29, 2012)...........................................App. 32

Deposition of Edward Logan .......................................................................App. 40

Testimony Deposition of Craig Mason (April 4, 2014) ................................App. 45

Christian Faith Fellowship Church Bookstore Receipt Journal ....................App. 63

February 23, 2005 Check from Charlotte Howard to CFFC Bookstore.........App. 66

Add A Zero QBooks Report of payments to Vendors....................................App. 67

QB\37662102.6
12/18/15 02:15 PM

> This Opinion is not a
> Precedent of the TTAB

Mailed: September 14, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*adidas AG*
*v.*
*Christian Faith Fellowship Church*

_____

Cancellation No. 92053314

_____

Angelo Notaro, John Zaccaria and Bradley S. Corsello of Notaro, Michalos & Zaccaria, P.C.,
 for adidas AG.

Richard W. Young and John E. Conour of Quarles & Brady LLP,
 for Christian Faith Fellowship Church.

_____

Before Seeherman, Taylor and Greenbaum,
 Administrative Trademark Judges.

Opinion by Greenbaum, Administrative Trademark Judge:

 adidas AG ("Petitioner") filed a petition for cancellation of two registrations

owned by Christian Faith Fellowship Church ("Respondent") for the marks ADD A

ZERO (in standard characters) and  for, as amended, "clothing, namely, shirts and caps."[1]

The grounds for cancellation are (1) nonuse prior to the filing dates of Respondent's use-based applications, rendering the registrations void ab initio; (2) abandonment of Respondent's registrations based on at least three consecutive years of nonuse with intent not to resume such use; and (3) failure of the marks to function as trademarks because ADD A ZERO is simply an informational slogan.[2]

Respondent, in its answer to the petition, admitted that Petitioner's application, Serial No. 77822018 for the mark ADIZERO, has been refused registration under Section 2(d) based on Respondent's registrations, and that Respondent never used the marks on pants,[3] and denied the remaining salient allegations in the petition.

Both parties filed briefs, and Petitioner file a reply brief.

For the reasons discussed below, we sustain the petition for cancellation on nonuse grounds. Accordingly, we need not and do not address Petitioner's claims of

---

[1] Registration Nos. 3173207 and 3173208, respectively, both issued on November 21, 2006. Respondent filed applications for the former on March 23, 2005, and the latter on March 24, 2005.

[2] The petition for cancellation also includes a claim that Respondent's marks are "ornamental and/or functional" (Pet. ¶¶ 24, 26, 11 TTABVUE 4), but Petitioner did not pursue this claim in its briefs. The claim, therefore, is deemed to be waived. *Krause v. Krause Publications Inc.*, 76 USPQ2d 1904, 1906 n.2 (TTAB 2005). We also note that the petition for cancellation originally included a claim for partial cancellation of the registrations pursuant to Section 18 of the Trademark Act, 15 U.S.C. § 1068. On February 3, 2014, the Board granted Petitioner's motion to withdraw said claim, and dismissed the claim with prejudice. 46 TTABVUE 1.

[3] The registrations originally included "pants" in the identification of goods, but these goods were deleted from the registrations with preclusive effect. *See* May 22, 2013 Board Order. 31 TTABVUE 6-7, 9.

abandonment or failure to function as trademarks, and we limit our discussion of the evidence, and any evidentiary objections, to Petitioner's claim of nonuse.

## I.   Evidentiary Issues

### A.  Petitioner's Motion to Strike Portions of Discovery Depositions

With its notices of reliance, Petitioner submitted portions of the discovery depositions of Respondent's Fed. R. Civ. P. 30(b)(6) designated witnesses, Craig Mason, Respondent's secretary, treasurer and executive pastor, and Edward Logan, Respondent's president and senior pastor.[4] Respondent submitted a notice of reliance pursuant to Trademark Rule 2.120(j)(4) on additional portions, with exhibits, of the Mason and Logan discovery depositions.[5] Petitioner previously moved to strike Respondent's notice of reliance. However, the Board deferred consideration of the motion until final hearing insofar as the motion relates to the additional portions from the Mason and Logan discovery depositions.[6] Along with its brief, Petitioner filed separate evidentiary objections which include a continuing

---

[4] 36 TTABVUE 336-526 (Petitioner's Ninth Notice of Reliance, portions of Mason Discovery Deposition with exhibits) and 36 TTABVUE 527-578 (Petitioner's Tenth Notice of Reliance, portions of Logan Discovery Deposition with exhibits).

[5] 57 TTABVUE, originally submitted as 49 TTABVUE. Respondent seeks to introduce eight additional portions from the Logan deposition with exhibits (57 TTABVUE 2-78), four additional portions from the Logan deposition (57 TTABVUE 79-85), and Respondent's Trial Exhibit No. 13 (57 TTABVUE 86-94).

[6] 56 TTABVUE. The Board also granted the motion to strike Respondent's Trial Exhibit No. 13 (originally submitted as 49 TTABVUE 86-94) on procedural grounds, and allowed Respondent time to submit a substitute notice of reliance with respect thereto. Respondent complied. 57 TTABVUE 86-94. Petitioner continues to object to this evidence in its brief (59 TTABVUE 14-15) and in its concurrently filed evidentiary objections (63 TTABVUE). We need not address this objection, however, because this exhibit pertains only to Petitioner's claim of abandonment.

objection to the additional portions from the Mason and Logan discovery depositions as improper rebuttal.[7]

Trademark Rule 2.120(j)(4) provides that if only part of a discovery deposition is made of record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party.

Respondent submitted only one excerpt from each of the discovery depositions in response to the deposition testimony that Petitioner submitted concerning the nonuse claim.[8] The additional testimony submitted by Respondent from the Mason discovery deposition is not outcome determinative. Indeed, in its brief, Respondent does not even mention the additional testimony or the excerpt to which the additional testimony purportedly relates. We therefore need not rule on the portion of the motion to strike directed to the Mason deposition.

Petitioner also submitted an excerpt from Mr. Logan's discovery deposition, in which he states that he does not know whether Respondent shipped any ADD A ZERO merchandise in interstate commerce prior to the filing dates of the applications.[9] Respondent submitted additional testimony from the Logan discovery deposition in which Mr. Logan testifies that Respondent has "members that live in Wisconsin, so they've purchased the Add A Zero" … "from the bookstore or maybe

---

[7] 59 TTABVUE 13.

[8] Mason Discov. Dep. 151:2-29, 57 TTABVUE 38 (purportedly to counter Mason Discov. Dep. 148:23-151:1, 36 TTABVUE 440-443), and Logan Discov. Dep. 38:22-39:5, 57 TTABVUE 84-85 (purportedly to counter Logan Discov. Dep. 37:16-38:21, 36 TTABVUE 567-568).

[9] 36 TTABVUE 566-568.

the internet as well. I don't know for sure."[10] We do not consider the additional excerpts necessary to make the initial excerpt submitted by Petitioner "not misleading," as they do not show that there were any such shipments, or provide an explanation as to why there were not. *See Swatch AG (Swatch SA) (Swatch Ltd.) v. M.Z. Berger & Co.*, 108 USPQ2d 1463, 1466 (sustaining objection to additional testimony because it did not "clarify or correct the testimony offered by opposer"), *aff'd, M.Z. Berger & Co. v. Swatch AG*, 114 USPQ2d 1892 (Fed. Cir. 2015). To the extent the testimony pertains to sales from the on-line bookstore, it is undisputed that Respondent launched its on-line bookstore (and first made ADD A ZERO merchandise available for sale through the on-line bookstore) in December 2010.[11] Accordingly, sales from the on-line bookstore could not have included any shipments of ADD A ZERO merchandise prior to the March 2005 filing dates of the applications. We therefore grant Petitioner's motion to strike the additional excerpts.[12]

## B. Objections to Mason Trial Testimony and Exhibits

Respondent's other evidence and testimony pertaining to Petitioner's nonuse claim is limited to Mr. Mason's trial testimony concerning: (1) sales and the availability for sale of ADD A ZERO apparel to out of state church members[13]; (2) a

---

[10] 38-39, 57 TTABVUE 83-84.

[11] Respondent's Answers to Interrogatory Nos. 3 and 7, 36 TTABVUE 286-287, and 36 TTABVUE 436.

[12] We add that consideration of Mr. Logan's excluded testimony would not have affected the outcome herein.

[13] 50 TTABVUE 15-16.

copy of a credit card receipt dated January 30, 2005 signed by Clementina Ekong[14]; and (3) a copy of three personal checks bearing addresses in Wisconsin, including one dated February 23, 2005 (prior to the filing date of Respondent's underlying applications) signed by Charlotte Howard;[15] and associated Exhibit 2, a printout of Respondent's receipt journal for sales of ADD A ZERO merchandise, Exhibit 3, a copy of Ms. Ekong's credit card receipt, and Exhibit 4, a copy of the personal checks.[16]

In the evidentiary objections filed with Petitioner's brief, Petitioner has objected to all of this testimony and to Exhibits 3 and 4 because Mr. Mason "did not testify that he actually observed" any of the sales, or the writing of the checks or the notes on the credit card receipt. As discussed below, Mr. Mason's testimony is based on his own knowledge, and it is relevant to the issue of nonuse. The objections to Mr. Mason's testimony are overruled.

We now turn to Petitioner's objections to Ms. Ekong's credit card receipt and Ms. Howard's personal check.

### 1.  Untimely Disclosure

Petitioner contends that neither document is admissible because Respondent produced them on November 22, 2013, after discovery had closed, and indeed, after Petitioner's testimony period had concluded. Petitioner, upon receipt of the

---

[14] 50 TTABVUE 17-20 and 29.

[15] 50 TTABVUE 21-25, 29.

[16] 50 TTABVUE 50-67 at 51-52 (Exhibit 2), 50 TTABVUE 68 (Exhibit 3) and 50 TTABVUE 69 (Exhibit 4). The other two checks in Exhibit 4 also bear Wisconsin addresses, but they post-date the filing date of the applications by approximately five months.

documents from Respondent, previously had objected on this basis.[17] With its response to Petitioner's objections, Respondent submitted a letter dated December 9, 2013 from Respondent's counsel to Petitioner's counsel stating:

> The four pages of documents that the Church produced on [November 22, 2013] were only just located. They were not responsive to any discovery served by adidas. Even so, and because the Church may rely on them in its case, we promptly produced the documents to you. While discovery in the proceeding is closed, the Church may be willing to consent to some additional, limited discovery about these documents. Please let me know what discovery adidas would like to take.[18]

In its response to Petitioner's evidentiary objections, Respondent states that Petitioner never responded to this letter, and Petitioner does not contend otherwise.

When asked why he had not previously produced the documents, Mr. Mason testified that "to my knowledge," they were not requested.[19] Petitioner did not make of record any discovery requests to which these documents would be responsive, nor did Petitioner file a reply brief to clarify this matter. Thus, we cannot say that Respondent is attempting to rely on documents that were requested but not produced in discovery, and for this reason alone we cannot say that the documents were not timely produced. Moreover, as Respondent points out in its response to this objection, Petitioner "had the opportunity four months before Mr. Mason's deposition to take discovery regarding these documents, but chose not to do so."[20]

---

[17] 59 TTABVUE 24-25.

[18] 61 TTABVUE 36.

[19] 50 TTABVUE 25 and 34.

[20] 61 TTABVUE 22,

Petitioner cannot now complain that it was deprived of the opportunity to take discovery regarding the documents. The objection is overruled.

### 2.    Hearsay

Petitioner's objection that the documents are inadmissible hearsay is overruled. The documents are admissible as business records pursuant to Fed. R. Ev. 803(6). Mr. Mason testified that the "check copies came from the records that were from bookstore sales" and that he keeps records for all bookstore sales "in my storeroom."[21] Similarly, Mr. Mason testified that he recognized the credit card receipt, and that it is a record that he maintained for the church.[22]

### 3.    Lack of Foundation

During his Rule 30(b)(6) discovery deposition, Mr. Mason testified that as executive pastor his duties include "the financial recordkeeping of the church and all the business aspects."[23] Based on this testimony, and the testimony regarding his practice of keeping the bookstore records in the storeroom, we find that Mr. Mason was familiar with the financial records of the bookstore, including the sales receipt and the personal check at issue. We therefore overrule this objection.

### 4.    Relevance

Petitioner also objects to the credit card receipt on grounds of relevance because Ms. Ekong resided in Illinois at the time of the sale. The credit card receipt is evidence of a sale of the goods, and therefore is relevant regardless of where Ms.

---

[21] 50 TTABVUE 24.

[22] 50 TTABVUE 17-18.

[23] 36 TTABVUE 352.

Ekong resided on January 30, 2005. The objection is overruled. We discuss below the probative value of the credit card receipt.

## II.    Standing

In the May 22, 2013 Board order, the Board granted partial summary judgment that Petitioner had established its standing.[24]

## III.    Background

Respondent operates a church in Illinois, close to the Wisconsin border.[25] Church members include residents of the states of Illinois and Wisconsin.[26]

In 2004, in connection with a fundraising campaign, Respondent decided to sell shirts and caps bearing the ADD A ZERO marks.[27] Between December 2004 and July 2005, Respondent bought from Icon Industries, a company based in Illinois, "a modest quantity" of shirts and caps embroidered with the ADD A ZERO marks "to sell in the church's bookstore, located in the basement of the church building."[28]

Prior to the commencement of this proceeding, ADD A ZERO shirts and caps were only available for sale in Respondent's bookstore.[29] Respondent produced during discovery a receipt journal itemizing the bookstore's sales of ADD A ZERO

---

[24] 31 TTABVUE 6.

[25] 50 TTABVUE 13.

[26] 50 TTABVUE 13-14.

[27] 36 TTABVUE 417-421, 36 TTABVUE 548-550, and Exh. PX27, 36 TTABVUE 572.

[28] Resp. Br. at 2, 60 TTABVUE 7. 36 TTABVUE 364, 371-374, 379, and Exhs. PX11-14, 36 TTABVUE 466-472.

[29] 36 TTABVUE 390. Although Mr. Mason testified that Respondent now has an online bookstore, as noted above, it began operating after this proceeding commenced. *Id*. at 286-287 and 436.

apparel, which both parties made of record.[30] Mr. Mason explained that the receipt journal lists all sales of ADD A ZERO shirts and caps from January 9, 2005 to July 3, 2011.[31] The receipt journal lists sales of approximately 60 ADD A ZERO caps and approximately 70 ADD A ZERO shirts from January 9, 2005 through March 5, 2005, and no additional sales of caps or shirts prior to the filing dates of the applications later that month.[32] Of these, Respondent particularly points to the sales dated January 30, 2005 in the amount of $51.12 for one ADD A ZERO shirt and one ADD A ZERO cap, and February 23, 2005 in the amount of $38.34 for two ADD A ZERO caps, to counter Petitioner's allegations of nonuse.[33]

Mr. Mason, in his testimony, cross-referenced the January 30, 2005 sale with the credit card receipt from Ms. Ekong, and the February 23, 2005 sale with the personal check from Ms. Howard.[34] There is no record evidence or testimony of any other sales that could support use of the ADD A ZERO marks in commerce prior to the filing dates of the applications.

---

[30] Petitioner made the receipt journal of record with Ninth Notice of Reliance, as Exhibit 7 to the Mason Discov. Dep., 36 TTABVUE 475-492. Respondent also introduced the receipt journal as Exhibit 2 to the Mason Tr. Test., 50 TTABVUE 50-67.

[31] 36 TTABVUE 393-415.

[32] 36 TTABVUE 475-480, 50 TTABVUE 50-55.

[33] 36 TTABVUE 476-477, 50 TTABVUE 51-52. The receipt journal lists other sales of ADD A ZERO merchandise on January 30, 2005 and February 23, 2005 (*id*.), but there is no testimony or other evidence concerning those sales, and Respondent does not mention them in its brief. We therefore give these other sales no further consideration.

[34] 50 TTABVUE 21-25 and 51-52 (Exhibit 2, receipt journal).

## IV.    Applicable Law - Nonuse

Under Section 1(a) of the Trademark Act, a mark may not be registered unless it is "used in commerce." 15 U.S.C. § 1051(a). Section 45 of the Trademark Act defines "use in commerce" as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade … (1) on goods when -- (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce. 15 USC 1127.

In addition, "[t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1125.

An application filed under Section 1(a) of the Trademark Act is void ab initio where it is found that there was no use of the mark in commerce on the identified goods prior to the filing date of the application.[35] *See Couture v. Playdom, Inc.*, 778 F.3d 1379, 113 USPQ2d 2042, 2043 (Fed. Cir. 2015) ("To apply for registration under Lanham Act § 1(a), a mark must be 'used in commerce.' 15 U.S.C. § 1051(a)(1). … Use in commerce must be 'as of the application filing date.' 37 CFR § 2.34(a)(1)(i)," and "The registration of a mark that does not meet the use [in commerce] requirement is void ab initio."), *citing Aycock Engineering Inc. v. Airflite Inc.*, 560 F.3d 1350, 90 USPQ2d 1301, 1305 (Fed. Cir. 2009); *ShutEmDown Sports*

---

[35] This statement is true for single class applications such as those underlying the registrations here at issue. We note that in multiple class applications, the failure to make use of the mark on goods in one of the classes will not affect the viability of the other classes.

*Inc. v. Lacy*, 102 USPQ2d 1036, 1045 (TTAB 2012) (nonuse by respondent at the time of filing the underlying use-based application resulted in cancellation of registration).

In the May 22, 2013 Board order denying the parties' cross-motions for summary judgment on nonuse and abandonment, the Board provided the following guidance to the parties:

> "'[C]ommerce' includes intrastate transactions that affect interstate or foreign commerce." *In re Silenus Wines, Inc.*, 557 F.2d 1977, 194 USPQ 261, 266-67 (CCPA 1977). The issue is whether the transactions exert "a substantial economic effect on interstate commerce, and irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" *Wickard v. Filburn*, 317 U.S. 111, 125 (1942). *Accord, In re U.S. Home Corporation of Texas*, 201 USPQ 602, 604 (TTAB 1978) ("We fail to perceive that what applicant does has any substantial effect on interstate commerce."). Evidence that the mark has been used in connection with services rendered to customers traveling across state boundaries may be sufficient for the use in commerce requirement. *Larry Harmon Pictures Corp. v. Williams Restaurant Corp.*, 929 F.2d 662, 18 USPQ2d 1292, 1295 (Fed. Cir. 1991); *Pamex Foods, Incorporated v. Clover Club Foods Company*, 201 USPQ 308, 314 n.5 (TTAB 1978).
>
> * * *
>
> … There are, at a minimum, genuine disputes remaining for trial relating to the impact of [R]espondent's sales of ADD A ZERO clothing in commerce which Congress may regulate ….[36]

Respondent contends that the sales of one shirt and one cap to Ms. Ekong and two caps Ms. Howard, and Respondent's offers to sell the merchandise to out-of-

---

[36] 31 TTABVUE 7-9.

state parishioners, are sufficient to show use in commerce of the marks on the goods prior to the filing dates of the underlying applications.

With respect to the sales transactions, although the evidence shows a sale of one shirt and one cap to Ms. Ekong on January 30, 2005, there is no evidence that this sale was made in interstate commerce, or in commerce that affects interstate commerce. There is simply no testimony or evidence as to where Ms. Ekong was living on January 30, 2005. At most, we have Mr. Mason's testimony that Ms. Ekong lived on the Great Lakes naval base in Illinois at the time of Mr. Mason's testimony in 2014, and that Ms. Ekong previously had been stationed there. Mr. Mason did not know if Ms. Ekong is a resident of Illinois, and he was not asked where she resided on January 30, 2005: "I'm not sure if she's a resident of Illinois. I do know that Ms. Ekong is in the military and that she was a member of the church. For a period of time, she left and has returned last year as she was re – reassigned to Great Lakes naval base."[37] As for the transaction involving Ms. Howard, her check bears an address in Wisconsin. We view this as evidence that she lived in Wisconsin and, combined with Mr. Mason's testimony that Respondent's parishioners live in Wisconsin as well as Illinois,[38] it is sufficient for us to conclude that she crossed state lines when she purchased the two caps in the Church's bookstore in Illinois on February 23, 2005.

---

[37] 50 TTABVUE 19. Further, even if there were evidence that Ms. Ekong was living on the Great Lakes naval base on January 30, 2005, Respondent has cited no statute or case law to the effect that simply because a consumer resides on a military base, a single intrastate sale not occurring on the base to such a person would be deemed a use in interstate commerce.

[38] 50 TTABVUE 13-14.

To be clear, prior to the filing dates of the underlying applications, all sales of shirts and caps were made in person to purchasers physically at Respondent's church bookstore in Illinois. Respondent does not argue that the shipments of shirts and caps from Icon Industries (located in Illinois) to Respondent, for subsequent sale by Respondent in Illinois, affect interstate commerce. *Compare Silenus Wines*, 194 USPQ at 263 (wine imported from France and subsequently sold intrastate constitutes use in commerce). Nor does Respondent argue that any customers, other than Ms. Howard (and possibly Ms. Ekong), came to the bookstore from other states to purchase the goods. Respondent's sole argument, as previously stated, is that the intrastate sales to Ms. Ekong and Ms. Howard, and the ability to sell the goods to out-of-state parishioners who cross state lines to attend the church, have an effect on interstate commerce.

Respondent relies on three cases from our primary reviewing court and its predecessor for the proposition that the marks were used in commerce because out-of-state parishioners crossed state lines to purchase ADD A ZERO apparel.[39] In the first case, *In re Gastown, Inc.*, 326 F.2d 780, 140 USPQ2d 216, 217 (CCPA 1964), the court held that an operator of service stations in Ohio that "provides automotive service and maintenance for customers who are travelling interstate on federal highways in the course of engaging in interstate commerce … directly affect[s] interstate commerce" because the services include gasoline delivery to "vehicles

---

[39] Although Respondent makes this broad statement in its brief, Respondent does not clearly articulate why Ms. Ekong falls in this category. Nonetheless, the remainder of this decision analyzes both sales for their impact, if any, on interstate commerce.

stalled on highways," which vehicles "[o]bviously … could not travel at all without the gasoline."

The court extended the *Gastown* rationale to goods in *Silenus Wines*, 194 USPQ2d at 263, and allowed registration of a mark used on wine imported from France because

> were it not for the intrastate sales anticipated by the appellant-importer, the foreign commerce that occurred in this case would probably not have occurred – unquestionably a direct effect. While appellant's importation is not itself a 'use in commerce' by appellant, it is evidence that appellant's sale within Massachusetts was so intimately involved with foreign commerce as to become a 'use in commerce' as defined in the Lanham Act.

*Id*. at 264. The court further held that "intrastate sale of goods, by the party who caused those goods to move in regulatable commerce, directly affects that commerce and is itself regulatable. Clearly, intrastate sale of imported wines by the importer sufficiently affects commerce with foreign nations to qualify those intrastate sales for the Trademark Act definition of 'commerce.'"

Respondent also relies on *Larry Harmon*, 18 USPQ2d at 1295, which held that a single-location restaurant that serves customers traveling across state lines constitutes "use in commerce."

Here, the sales to Ms. Howard and Ms. Ekong were made in the church bookstore in Illinois, and the transfers of goods from Respondent to Ms. Howard and Ms. Ekong occurred at the time of the sales. Although there are situations in which intrastate sales may be found to have such an effect on commerce that may be controlled by Congress that the activities constitute use in commerce, there must be

a showing that the activities have such an effect. *See Silenus Wines*, 194 USPQ at 264. *Compare In re Cook, United, Inc.*, 188 USPQ 284, 287 (TTAB 1975) (applicant who sells a product exclusively within a single state cannot satisfy the "use in commerce" requirement by relying on the fact that purchasers of the product may come from another state and/or transport the product across state lines); *In re The Bagel Factory, Inc.*, 183 USPQ 553, 554 (TTAB 1974) (sales entirely within Michigan cannot support federal registration even when a customer transported the product to Ohio after sale). In this instance, we find that the sale of two ADD A ZERO caps at a minimal cost within the state of Illinois to Ms. Howard, who resides outside the state, does not affect commerce that Congress can regulate such that the transaction would constitute use in commerce for purposes of registration.[40]

To the extent Respondent suggests that simply offering its ADD A ZERO caps and shirts in the bookstore to parishioners who reside out of state prior to the filing dates of the applications, combined with the sales to Ms. Howard and Ms. Ekong (which we have already found insufficient), constitute use of the marks in commerce,[41] Respondent cites no support for this proposition, and we are not aware of any. Section 45 of the Trademark Act does not provide a means to obtain a registration based on use in commerce without making a "bona fide use of the mark in the ordinary course of trade" which, as set forth in Section 45(1)(B), requires

---

[40] We have already found that the testimony regarding Ms. Ekong is not sufficient to show that she could be considered an out-of-state resident at the time the sale was made to her. In any event, the minimal sale to Ms. Ekong of one ADD A ZERO cap and one ADD A ZERO shirt was not sufficient for us to conclude that it affected commerce regulable by Congress or that the combined sales to Ms. Ekong and Ms. Howard had such an effect.

[41] 60 TTABVUE 11-13.

"that the goods are sold or transported in commerce." *Compare Couture v. Playdom*, 113 USPQ2d at 2043-2044 (merely offering a service, without actually providing it, does not constitute use in commerce). Thus, Respondent cannot rely on the fact that its goods *could* have been purchased by people who reside out of state, and Respondent is still left with the sale in Illinois of two caps to a Wisconsin resident as the only evidence of a sale that arguably could affect interstate commerce. This sale is de minimis and, under the circumstances shown here, is insufficient to show use that affects interstate commerce.

We therefore find that Respondent did not make use of its marks on its identified goods in commerce prior to the filing of its use-based applications.

**Decision**: The petition to cancel Respondent's marks ADD A ZERO and  is granted on the ground of nonuse. Registration Nos. 3173207 and 3173208 will be cancelled in due course.

Form PTO 55 (12-80)

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

December 8, 2015
_____
(Date)

**THIS IS TO CERTIFY** that the annexed is an accurate statement of the content entries in the file of the trademark cancellation proceeding and involved registration identified below. The list was taken from the TSDR and TTABvue electronic databases of this Office and comprises the record before the United States Patent and Trademark Office.

**Christian Faith Fellowship Church v. Adidas AG**

**Cancellation No. 92053314**

**(Application No.: 92/053,314)**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Certifying Officer*

## PROSECUTION HISTORY OF CANCELLATION NO. 92053314

| DATE | DESCRIPTION |
|------|-------------|
| 11/23/2010 | PETITION FOR CANCELLATION |
| 11/29/2010 | ORDER: NOTICE AND TRIAL DATES SENT; ANSWER DUE |
| 01/03/2011 | DEFENDANT'S MOTION OF EXTENSION OF TIME W/ CONSENT |
| 01/03/2011 | ORDER: MOTION TO EXTEND GRANTED |
| 03/08/2011 | ANSWER |
| 09/07/2011 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME W/ CONSENT |
| 09/07/2011 | ORDER: MOTION TO EXTEND GRANTED |
| 11/02/2011 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME W/ CONSENT |
| 11/02/2011 | ORDER: MOTION TO EXTEND GRANTED |
| 11/07/2011 | PLAINTIFF'S STIPULATION TO ENTRY OF FIRST AMENDED CONSOLIDATED PETITION FOR CANCELLATION |
| 12/15/2011 | ANSWER TO PETITIONER'S FIRST AMENDED CONSOLIDATED PETITION TO CANCEL |
| 02/02/2012 | ORDER: AMENDED PETITION TO CANCEL; ACCEPTED |
| 04/04/2012 | PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| 04/04/2012 | PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - EXHIBITS |
| 04/04/2012 | PLAINTIFF'S SUMMARY JUDGMENT (CONFIDENTIAL) |
| 04/04/2012 | DECLARATION OF J. ZACCARIA |
| 04/04/2012 | DECLARATION OF E. BRIDGES |
| 04/04/2012 | DECLARATION OF E. BRIDGES - EXH A (CONFIDENTIAL) |
| 04/04/2012 | DECLARATION OF J. ZACCARIA – EXHIBITS (CONFIDENTIAL) |
| 04/12/2012 | STIPULATED PROTECTIVE ORDER |
| 04/17/2012 | PLAINTIFF'S PRETRIAL DISCLOSURES |
| 04/24/2012 | ORDER: SUSPENDED PENDING DECISION ON MOTION FOR SUMMARY JUDGMENT; STIPULATED PROTECTIVE ORDER NOTED AND APPROVED |
| 05/03/2012 | DEFENDANT'S MOTION TO AMEND REGISTRATION |
| 05/09/2012 | DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT |
| 05/24/2012 | ORDER: CORRECTION TO 4/24/2012 SUSPENSION ORDER ) |
| 06/12/2012 | PLAINTIFF'S COMBINED REPLY IN SUPPORT OF SUMMARY JUDGMENT MOTION AND RESPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT |
| 06/12/2012 | EXHIBITS TO PLAINTIFF'S COMBINED REPLY IN SUPPORT OF |

|  | SUMMARY JUDGMENT MOTION AND RESPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT |
| --- | --- |
| 07/02/2012 | DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT |
| 10/05/2012 | DEFENDANT'S MOTION FOR REQUEST FOR LEAVE TO FILE CORRECTED EXHIBIT A TO MOTION TO AMEND REGISTRATION |
| 05/22/2013 | ORDER RE: MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO AMEND REGISTRATION |
| 08/07/2013 | PLAINTIFF'S MOTION FOR AND EXTENSION W/ CONSENT |
| 08/15/2013 | ORDER: EXTENSION OF TIME GRANTED |
| 09/16/2013 | PLAINTIFF'S TESTIMONY: E. BRIDGES DEPOSITION |
| 09/16/2013 | PLAINTIFF'S NOTICE OF ELECTRONIC FILING OF TESTIMONY DEPOSITION OF E. BRIDGES AND EXHIBITS |
| 09/16/2013 | PLAINTIFF'S FIRST NOTICE OF RELIANCE |
| 10/10/2013 | PLAINTIFF'S TESTIMONY: W. SHANKS DEPOSITION |
| 10/10/2013 | PLAINTIFF'S NOTICE OF ELECTRONIC FILING OF TESTIMONY DEPOSITION OF W. SHANKS AND EXHIBITS |
| 10/16/2013 | PLAINTIFF'S OBJECTION AND MOTION TO QUASH |
| 10/17/2013 | ORDER: PROCEEDINGS SUSPENDED PENDING DISPOSITION OF PLAINTIFF'S MOTION TO QUASH |
| 11/05/2013 | DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO QUASH |
|  |  |
| 11/21/2013 | PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO QUASH |
| 11/21/2013 | PLAINTIFF'S WITHDRAWAL OF CLAIM FOR PARTIAL CANCELLATION |
| 01/17/2014 | DEFENDANT'S MOTION FOR ENTRY OF JUDGMENT AGAINST PETITIONER ON PARTIAL-CANCELLATION CLAIM |
| 02/03/2014 | ORDER: PROCEEDINGS RESUMED |
| 03/05/2014 | STIPULATION FOR EXTENSION OF TRIAL DATES |
| 03/31/2014 | ORDER: EXTENSION OF TRIAL DATES GRANTED |
| 04/11/2014 | DEFENDANT'S NOTICE OF RELIANCE |
| 05/05/2014 | DEFENDANT'S NOTICE OF TAKING TESTIMONY: DEPOSITION OF C. MASON |
| 05/05/2014 | DEFENDANT'S NOTICE OF ELECTRONIC FILING OF TESTIMONY DEPOSITION OF C. MASON WITH EXHIBITS |
| 05/07/2014 | PLAINTIFF'S MOTION TO STRIKE RESPONDENT'S NOTICE OF RELIANCE |

| 05/22/2014 | PLAINTIFF'S FIFTEENTH NOTICE OF RELIANCE |
| 05/27/2014 | DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE |
| 05/30/2014 | ORDER: PROCEEDINGS SUSPENDED PENDING DISPOSITION OF PLAINTIFF'S MOTION TO STRIKE |
| 09/11/2014 | ORDER RE: MOTION TO STRIKE; PROCEEDINGS RESUMED |
| 09/11/2014 | DEFENDANT'S SUBSTITUTE NOTICE OF RELIANCE |
| 10/30/2014 | PLAINTIFF'S TRIAL BRIEF |
| 10/30/2014 | PLAINTIFF'S STATEMENT OF EVIDENTIARY OBJECTIONS |
| 12/01/2014 | DEFENDANT'S TRIAL BRIEF |
| 12/01/2014 | DEFENDANT'S RESPONSE TO PETITIONER'S EVIDENTIARY OBJECTIONS AND OBJECTIONS TO PETITIONER'S EVIDENCE |
| 12/15/2014 | PLAINTIFF'S REPLY TRIAL BRIEF |
| 12/15/2014 | PLAINTIFF'S REPLY TO RESPONDENT'S RESPONSE TO PETITIONER'S EVIDENTIARY OBJECTIONS; RESPONSE TO RESPONDENT'S EVIDENTIARY OBJECTIONS |
| 12/29/2014 | DEFENDANT'S REPLY IN SUPPORT OF ITS OBJECTIONS TO PETITIONER'S EVIDENCE |
| 04/13/2015 | BOARD ORDER |
| 04/23/2015 | SUBMITTED BRIEF (CONFIDENTIAL) |
| 09/14/2015 | BOARD DECISION: GRANTED |
| 10/29/2015 | NOTICE OF APPEAL TO CAFC |

## PROSECUTION HISTORY OF SERIAL NO. 78593318
### (Cancellation No. 92053314)

| DATE | DESCRIPTION |
|---|---|
| 03/23/2005 | APPLICATION |
| 03/23/2005 | SPECIMEN |
| 03/23/2005 | DRAWING |
| 10/17/2005 | XSEARCH SEARCH SUMMARY |
| 10/19/2005 | OFFICE ACTION OUTGOING |
| 04/19/2006 | RESPONSE TO OFFICE ACTION |
| 05/02/2006 | OFFICE ACTION OUTGOING |
| 05/17/2006 | RESPONSE TO OFFICE ACTION |
| 05/17/2006 | CHANGE OF ADDRESS |
| 06/23/2006 | NOTATION TO FILE |
| 06/24/2006 | TRADEMARK SNAPSHOT PUBLICATION STYLESHEET |
| 08/16/2006 | NOTICE OF PUBLICATION UNDER 12(a) |
| 11/21/2006 | REGISTRATION CERTIFICATE |
| 02/24/2012 | SPECIMEN |
| 02/24/2012 | DECLARATION OF USE AND/OR EXCUSABLE NONUSE OF MARK IN COMMERCE UNDER SECTION 8 |
| 04/09/2012 | POST REGISTRATION OFFICE ACTION |
| 10/09/2012 | RESPONSE TO OFFICE ACTION FOR POST-REGISTRATION MATTERS |
| 02/09/2014 | NOTICE OF ACCEPTANCE UNDER SECTION 8 |

## PROSECUTION HISTORY OF SERIAL NO. 78594295
### (Cancellation No. 92053314)

| DATE | DESCRIPTION |
|------|-------------|
| 03/24/2005 | APPLICATION |
| 03/24/2005 | DRAWING |
| 03/24/2005 | SPECIMEN |
| 10/17/2005 | XSEARCH SEARCH SUMMARY |
| 10/19/2005 | OFFICE ACTION OUTGOING |
| 04/19/2006 | RESPONSE TO OFFICE ACTION |
| 05/17/2006 | RESPONSE TO OFFICE ACTION |
| 05/17/2006 | CHANGE OF ADDRESS |
| 06/23/2006 | NOTATION TO FILE |
| 06/24/2006 | TRADEMARK SNAPSHOT PUBLICATION STYLESHEET |
| 08/16/2006 | NOTICE OF PUBLICATION UNDER 12(a) |
| 11/21/2006 | REGISTRATION CERTIFCATE |
| 02/24/2012 | SPECIMEN |
| 02/24/2012 | DECLARATION OF USE AND/OR EXCUSABLE NONUSE OF MARK IN COMMERCE UNDER SECTION 8 |
| 04/09/2012 | NOTICE OF ACCEPTANCE UNDER SECTION 8 |

Int. Cl.: 25

Prior U.S. Cls.: 22 and 39

**United States Patent and Trademark Office**

Reg. No. 3,173,207

Registered Nov. 21, 2006

**TRADEMARK**
**PRINCIPAL REGISTER**

# ADD A ZERO

CHRISTIAN FAITH FELLLOWSHIP CHURCH
(ILLINOIS CORPORATION)
1727 27TH STREET
ZION, IL 60099

FOR: CLOTHING, NAMELY SHIRTS, PANTS AND CAPS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 1-9-2005; IN COMMERCE 1-9-2005.

THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-593,318, FILED 3-23-2005.

PRISCILLA MILTON, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cls.: 22 and 39

**United States Patent and Trademark Office**

Reg. No. 3,173,208

Registered Nov. 21, 2006

## TRADEMARK
### PRINCIPAL REGISTER



CHRISTIAN FAITH FELLOWSHIP CHURCH (IL-
LINOIS CORPORATION)
1727 27TH STREET
ZION, IL 60099

FOR: CLOTHING, NAMELY SHIRTS, PANTS
AND CAPS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 1-9-2005; IN COMMERCE 1-9-2005.

SER. NO. 78-594,295, FILED 3-24-2005.

PRISCILLA MILTON, EXAMINING ATTORNEY

J287-839

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

In the Matter of Registration Nos. 3,173,207 and 3,173,208
For the mark ADD A ZERO and ADD A ZERO & Design
-----------------------------------------------------------------x

| | | |
|---|---|---|
| adidas AG, | : | |
| | : | Cancellation No. 92053314 |
| Petitioner, | : | |
| | : | |
| v. | : | **FIRST AMENDED** |
| | : | **CONSOLIDATED** |
| | : | <u>**PETITION TO CANCEL**</u> |
| Christian Faith Fellowship Church, | : | |
| | : | |
| Respondent. | : | |

-----------------------------------------------------------------x

Petitioner, adidas AG, a German joint stock company, located at Adi-Dassler-Strasse 1, Herzogenaurach, Germany ("Petitioner") believes that it will be damaged by Registration No. 3,173,207 for the mark ADD A ZERO and Registration No. 3,173,208 for the mark ADD A ZERO & Design and hereby petitions to cancel the same.

As grounds for this Petition, it is alleged that:

1.    Petitioner owns Application No. 77/822,018 for the mark ADIZERO for "footwear, shirts, singlets, jackets, shorts, tights, bottoms" in International Class 25.

2.    The Christian Faith Fellowship Church ("Respondent") is listed in the United States Patent and Trademark Office ("USPTO") records as the owner of record of Registration No. 3,173,207 for the mark ADD A ZERO for "clothing, namely shirts, pants and caps" in International Class 25 and Registration No. 3,173,208 for the mark ADD A ZERO & Design for "clothing, namely shirts, pants and caps" in International Class 25 ("Respondent's goods").

3.    Registration No. 3,173,207 for the mark ADD A ZERO issued from Application Serial No. 78/593, 318 ("the '318 Application").  The '318 Application was filed on the basis of  use on March 23, 2005.  The '318  Application claims a date of first use in commerce of the ADD A ZERO mark of January 9, 2005.

4.    Registration No. 3,173,208 for the mark ADD A ZERO & Design issued from Application Serial No. 78/594, 295 ("the '295 Application").  The '295 Application was filed on the basis of use on March 24, 2005.  The '295 Application claims a date of first use in commerce of the ADD A ZERO & Design mark of January 9, 2005.

5.    Petitioner's Application Serial No. 77/822,018 for the mark ADIZERO ("Petitioner's Application") has been refused registration by the USPTO Examining Attorney based on asserted likelihood of confusion with Registration No. 3,173,207 for ADD A ZERO and Registration No. 3,173,208 for ADD A ZERO & Design, under Section 2(d) of the Trademark Act.

6.    On information and belief, Respondent had not used the ADD A ZERO mark in commerce for any of the goods listed in the '318 Application on or prior to the filing date of the '318 Application.

7.     On information and belief, Respondent had not used the ADD A ZERO mark in commerce for any of the goods listed in the '318 Application on or prior to issuance of Registration No. 3,173,207.

8.    Registration No. 3,173,207 is void <u>ab initio</u> based on non-use of the ADD A ZERO mark.

9.    On information and belief, Respondent had not used the ADD A ZERO & Design mark in commerce for any of the goods listed in the '295 Application on or prior to the filing

date of the '295 Application.

10.     On information and belief, Respondent had not used the ADD A ZERO & Design mark in commerce for any of the goods listed in the '295 Application on or prior to issuance of Registration No. 3,173,208.

11.     Registration No. 3,173,208 is void <u>ab initio</u> based on non-use of the ADD A ZERO & Design mark.

12.     Upon information and belief, Respondent is not using the marks ADD A ZERO and ADD A ZERO & Design in commerce on or in connection with the goods listed in Registration No. 3,173,207 and Registration No. 3,173,208.

13.     Upon information and belief, Respondent has never used the ADD A ZERO mark in commerce on or in connection with pants.

14.     Upon information and belief, Respondent has never used the ADD A ZERO & Design mark in commerce on or in connection with pants.

15.     Upon information and belief, Respondent has discontinued use of the marks ADD A ZERO and ADD A ZERO & Design, with no intent to resume use.

16.     Upon information and belief, Respondent did not use the marks ADD A ZERO and ADD A ZERO & Design in commerce on or in connection with Respondent's goods for at least three (3) years prior to the commencement of the subject cancellation.

17.     Any use and/or resumption of use of the marks  ADD A ZERO and ADD A ZERO & Design by Respondent on or in connection with Respondent's goods has been spurred by the commencement of the subject cancellation.

18.     Upon information and belief, Respondent has abandoned the marks  ADD A ZERO and ADD A ZERO & Design.  Section 45 of the Trademark Act, 15 U.S.C. § 1127.

3

19.    The marks ADD A ZERO and ADD A ZERO & Design include the word "add" which means to make an addition.

20.    The marks ADD A ZERO and ADD A ZERO & Design include the word "zero" which means a numerical symbol.

21.    The ADD A ZERO & Design mark includes a design of a plus sign.

22.    Upon information and belief, Respondent uses and/or has used the words "ADD A ZERO" as a slogan for Respondent's fundraising activities in connection with Respondent's church.

23.    Upon information and belief, Respondent uses and/or has used the words "ADD A ZERO" as a message to Respondent's members to increase the amount of a member's donation to Respondent.

24.    The ADD A ZERO mark is ornamental and/or functional.

25.    The ADD A ZERO mark does not function as a trademark to identify and distinguish Respondent's goods from those of others and to indicate the source of Respondent's goods.

26.    The ADD A ZERO & Design mark is ornamental and/or functional.

27.    The ADD A ZERO & Design mark does not function as a trademark to identify and distinguish Respondent's goods from those of others and to indicate the source of Respondent's goods.

28.    In the alternative, Petitioner seeks a partial cancellation of Registration No. 3,173,207 and Registration No. 3,173,208 under Section 18 of the Trademark Act, 15 U.S.C. § 1068.

29.    On information and belief, any use of ADD A ZERO and ADD A ZERO & Design by

4

Respondent has been limited to caps and shirts printed with information in the nature of fundraising messages.

30.     Registration No. 3,173,207 and Registration No. 3,173,208 are overbroad in that they cover all forms of caps, shirts and pants without specifying the type, nature or trade channel of the clothing for which Respondent uses the ADD A ZERO mark and ADD A ZERO & Design mark.

31.     Petitioner requests, in the alternative, that Registration No. 3,173,207 and Registration No. 3,173,208 be restricted to "caps and shirts printed with information in the nature of fundraising messages."

32.     The restriction would conform the identification of Registration No. 3,173,207 and Registration No. 3,173,208 to the actual use of the ADD A ZERO mark and ADD A ZERO & Design mark.

33.     Petitioner's Application has been refused under Section 2(d) of the Trademark Act on the ground that Petitioner's adizero mark so resembles the marks of Registration No. 3,173,207 and Registration No. 3,173,208 as to be likely, when used with the identified goods to cause confusion, or to cause mistake, or to deceive.

34.     Petitioner's ADIZERO mark and Respondent's ADD A ZERO and ADD A ZERO & Design marks have different appearances, sounds, meanings and commercial impressions.

35.     Petitioner's goods sold under Petitioner's ADIZERO mark travel in different trade channels than those of Respondent's goods.

36.     On information and belief, there has been no actual confusion between Petitioner's ADIZERO mark and Respondent's ADD A ZERO and ADD A ZERO & Design marks.

37.     Entry of the proposed restriction will avoid any likelihood of confusion between

5

Petitioner's ADIZERO mark and the ADD A ZERO mark and ADD A ZERO & Design mark.

38.     Petitioner is being damaged by the continued registration by Respondent of the mark ADD A ZERO as set forth in Respondent's Registration No. 3,173,207 and ADD A ZERO & Design as set forth in Respondent's Registration No. 3,173,208, in that Respondent's registrations have been cited by the USPTO Examining Attorney as a bar to registration of Petitioner's mark ADIZERO.

WHEREFORE, Petitioner adidas AG prays that this Consolidated Petition to Cancel be granted and that Registration No. 3,173,207 and Registration No. 3,173,208 be cancelled, or, in the alternative, partially cancelled in the form of a restriction.

Dated: November 7, 2011                    Respectfully submitted,

/s/ Angelo Notaro
Angelo Notaro
anotaro@notaromichalos.com
John Zaccaria
Jzaccaria@notaromichalos.com
Notaro, Michalos & Zaccaria P.C.
100 Dutch Hill Road
Orangeburg, New York 10962
Tel: (845) 359-7700

Attorneys for Petitioner

6

Page 1

1      IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

2        BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

3

4   In the matter of Registration Nos. 3,173,207 and

5   3,173,208 for the mark ADD A ZERO and

6   ADD A ZERO & DESIGN

7   ADIDAS AG,                    )

8          Petitioner,           )

9      vs.                       ) Cancellation

10   CHRISTIAN FAITH             ) No. 92053314

11   FELLOWSHIP CHURCH,          )

12          Respondent.          )

13

14          The deposition of CRAIG MASON, called for

15   examination taken pursuant to the provisions of the

16   Code of Civil Procedure and the Rules of the

17   Supreme Court of the State of Illinois pertaining

18   to the taking of depositions for the purpose of

19   discovery taken before RAELENE STAMM,

20   CSR No. 084-004445, Certified Shorthand Reporter

21   licensed by the State of Illinois, on the 29th day

22   of February, 2012, at One North LaSalle Street,

23   Suite 400, Chicago, Illinois, at the hour of

24   9:30 a.m.

```
1        APPEARANCES:
2              NOTARO, MICHALOS & ZACCARIA, P.C.
               BY:  MR. ANGELO NOTARO
3                  MR. JOHN ZACCARIA
               1270 Broadway, Suite 807
4              New York, New York  10001
               (212) 278-8600
5                  On behalf of the Petitioner;
6              QUARLES & BRADY, LLP
               BY:  MR. RICHARD W. YOUNG
7              300 North LaSalle Street, Suite 4000
               Chicago, Illinois  60654
8              (312) 715-5260
                   On behalf of the Respondent.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 27

1    Q.   Hang tags are usually tags that have

2    little strings attached to a tag, and then on the

3    other end is attached to the product maybe around a

4    button.

5    A.   No.

6    Q.   Okay.  Who made the products for CFFC that

7    had the words Add A Zero on them?

8    A.   The first vendor we used was Icon

9    Industries which changed their name to Fast Art.

10   I'm not sure if they did any work for us under that

11   name.  And presently we have been utilizing a

12   company called American Outfitters.

13   Q.   Were products with the words Add A Zero

14   ever made for the CFFC by any other company or

15   person?

16   A.   Not to my knowledge.

17   Q.   When did American Outfitters first make

18   products with the words Add A Zero for the CFFC?

19   A.   I don't know offhand.

20   Q.   Was it after this proceeding was

21   commenced?

22   A.   I'm not sure.  I would have to look at

23   invoice dates.

24   MR. NOTARO:  I hand the court reporter a

Page 44

```
 1      Q.   At the top of Exhibit 5, is it -- strike

 2   that.

 3           Exhibit 5 is a chain e-mail, correct, so

 4   that's more than one e-mail?

 5      A.   Yes.

 6      Q.   Okay.  On the e-mail at the top of

 7   Exhibit 5 on the first page dated December 9, 2004,

 8   who was the sender of the e-mail?

 9      A.   The sender of that e-mail would have been

10   Alisha Harris who was the church secretary at the

11   time.

12      Q.   And were you a recipient of the e-mail

13   from Alisha Harris on December 9, 2004, at

14   3:54 p.m.?

15      A.   Yes.

16      Q.   And does this e-mail refer to an order

17   being placed for Add A Zero merchandise?

18      A.   Yes.

19      Q.   And is it an order for the merchandise

20   that is reflected as -- for which payments are

21   reflected as being made on Exhibit 2 on December 9,

22   2004, and January 7, 2005?

23      A.   Yes.

24      Q.   Do Exhibits 3, 4 and 5 accurately reflect
```

Page 86

1     A.    Alisha Harris.

2     Q.    Is she still working for the church at

3   this time?

4     A.    No.

5     Q.    When did she -- her employment end?

6     A.    I believe in 2006.  I'm not sure, but I

7   believe it was 2006.  I would have to check her

8   employer records.

9     Q.    Were the words Add A Zero ever used on

10  packaging for apparel?

11    A.    No.

12    Q.    Were the words Add A Zero used in

13  connection with other activities of the CFFC?

14    A.    In support of the building fund campaign.

15    Q.    How were the words Add A Zero used in

16  support of the building fund campaign?

17    A.    It was utilized in a promotion to promote

18  the sale of the product and that the proceeds were

19  as always that they would go toward the paying off

20  of the land and the building that the church owned.

21    Q.    That was existing land and building that

22  the church owned?

23    A.    The land was purchased in 2005.  The

24  church purchased 40 acres of land in 2005.

1    A.    I believe that was in the beginning of

2  2005.

3    Q.    And did the building fund fund-raising

4  campaign ever end?

5    A.    No.

6    Q.    It's still going on today?

7    A.    We've had multiple campaigns over the

8  years.

9    Q.    Did the CFFC organize events to raise

10  funds for the building fund campaign?

11    A.    What do you mean by events?

12    Q.    Well, did they have, for example,

13  bizarres, carnivals, events, other types of events?

14    A.    None that I can recall.

15    Q.    Was any explanation ever given to the

16  congregation of why the CFFC was using the words

17  Add A Zero?

18    A.    Yes.

19    Q.    Okay.  How were those explanations

20  provided?

21    A.    The senior pastor made the announcement to

22  the congregation in regard to how it was being used

23  from the prophetic word that was spoken by the

24  traveling evangelist back in 2004 I believe it was.

Page 90

1      Q.   Can you tell us as best you can what was

2   said to the congregation?

3      A.   That based on a prophetic word that God is

4   adding a zero to the income of the church, that in

5   support of paying off the land of the church and

6   the building at that time, that the apparel would

7   be sold -- the Add A Zero apparel would be sold,

8   and all proceeds would go toward the building

9   fund -- into the building fund account.

10     Q.   Were the congregations -- the congregation

11  asked for a donation to the building fund?

12     A.   We ask for donations to the building fund

13  weekly through the offering envelopes that we

14  provide.

15     Q.   And do you ever use the name Add A Zero in

16  connection with that?

17     A.   It has been used.

18     Q.   How has it been used?

19     A.   I has been used with the use of the

20  campaign to purchase apparel in support of the

21  building fund program.

22     Q.   Has the congregation ever been asked to

23  increase their donations by adding a zero to the

24  amount being donated in connection with the

Page 136

1    proceeding began.

2        Q.    Where have CFFC Add A Zero products been

3    sold geographically?

4        A.    In the state of Illinois.  We also have

5    members of the church that live in Wisconsin which

6    is 15 minutes across the state line.  And we also

7    are located near Great Lakes Naval Training Center,

8    and we have quite a few military personnel that

9    come, stay there for a couple years and travel all

10   over the world.  So I guess one can assume if any

11   of that apparel has been purchased, it could be

12   anywhere from Japan to who knows where.

13       Q.    But it's sold in this store, correct?

14       A.    Yes, that's correct.  It is sold in the

15   store.

16       Q.    Is it sold anywhere outside of Illinois?

17       A.    It is available on the website at this

18   time as well.

19       Q.    All right.  The website -- it was not

20   available on the website prior to this proceeding

21   being commenced, correct?

22       A.    That is correct.  It was not available, to

23   my knowledge.

24       Q.    Has the Add A Zero ever been sold in

1   IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

2   BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

3

4   In the matter of Registration Nos. 3,173,207 and

5   3,173,208 for the mark ADD A ZERO and

6   ADD A ZERO & DESIGN

7   ADIDAS AG,                    )

8            Petitioner,      )

9      vs.                     ) Cancellation

10  CHRISTIAN FAITH              ) No. 92053314

11  FELLOWSHIP CHURCH,          )

12           Respondent.      )

13

14           The deposition of EDWARD LOGAN, called for

15  examination taken pursuant to the provisions of the

16  Code of Civil Procedure and the Rules of the

17  Supreme Court of the State of Illinois pertaining

18  to the taking of depositions for the purpose of

19  discovery taken before RAELENE STAMM,

20  CSR No. 084-004445, Certified Shorthand Reporter

21  licensed by the State of Illinois, on the 1st day

22  of March, 2012, at One North LaSalle Street,

23  Suite 400, Chicago, Illinois, at the hour of

24  9:30 a.m.

```
1      APPEARANCES:
2           NOTARO, MICHALOS & ZACCARIA, P.C.
            BY:  MR. ANGELO NOTARO
3                MR. JOHN ZACCARIA
            1270 Broadway, Suite 807
4           New York, New York  10001
            (212) 278-8600
5                On behalf of the Petitioner;
6           QUARLES & BRADY, LLP
            BY:  MR. RICHARD W. YOUNG
7           300 North LaSalle Street, Suite 4000
            Chicago, Illinois  60654
8           (312) 715-5260
                 On behalf of the Respondent.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 13

1   and my wife.  So the trademark Add A Zero was used

2   just for that, you know, we're still being added

3   to.

4       Q.    What was going to be added to the church

5   and your wife and yourself?

6       A.    Well, if you -- I think you do have some

7   of the apparel.  There's a scripture on the back of

8   the hat, the cap, that says, God is going to

9   increase you and your family more and more.  It's

10  more of a wholistic adding, not just financial, not

11  just health, it's the whole thing.

12      Q.    And what -- did you explain that to the

13  congregation?

14      A.    Absolutely.

15      Q.    How did you explain that to the

16  congregation?

17      A.    The same way I explained it to you, sir.

18      Q.    And then beginning with the first time

19  that you explained this to the congregation, what

20  other times did you -- what other things did you do

21  to promote the Add A Zero campaign to the

22  congregation?

23      A.    The Add A Zero caps, shirts are worn at

24  picnics, certain events, fourth Sundays, that kind

Page 14

1    of thing.

2       Q.   Was Add A Zero ever displayed within the

3    church?

4       A.   In the bookstore.

5       Q.   In the bookstore, okay.

6            Was it ever displayed on any video

7    display?

8       A.   Yes.

9       Q.   Where was the display, the video display?

10      A.   In the main sanctuary.

11      Q.   And can you describe how it was displayed

12   in the main sanctuary?

13      A.   Can you be more specific?

14      Q.   You said the Add A Zero was displayed, the

15   video display was in the main sanctuary, correct?

16      A.   Correct.

17      Q.   And the Add A Zero was displayed on the

18   video in the main sanctuary?

19      A.   Yes.

20      Q.   And what -- could you describe what was

21   displayed?

22      A.   The cap and the shirt.

23      Q.   Okay.  Was it ever -- was the Add A Zero

24   ever used in any messages conveyed to the

Page 15

1    congregation?

2        A.    Messages being -- can you be more

3    specific, please?

4        Q.    Okay.  In your -- do you speak to your

5    congregation on a regular basis?

6        A.    Yes.

7        Q.    Okay.  And you speak to them for various

8    reasons, correct?

9        A.    When you say speak, you mean preach, teach

10   instruct or --

11       Q.    All of the above.

12       A.    Yes.

13       Q.    And in any of your preaching, teaching or

14   instruction, have you mentioned Add A Zero?

15       A.    Yes.

16       Q.    Okay.  How have you mentioned it in those

17   contexts?

18       A.    Basically God is going to add to the

19   church.  He's going to add to you.  Let's -- I

20   guess the same things I've been saying to you

21   basically about a wholistic approach.  It's a

22   trademark.  Let's think wholistically about our

23   well-being spiritually, financially, the whole

24   thing.

Page 1

1   IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

    BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

2

        In the Matter of Registration Nos. 3,173,207

3                    and 3,173,208

          Mark:  ADD A ZERO and ADD A ZERO & Design

4         Date of Registration:  November 21, 2006

5   Adidas AG,

6        Petitioner,

7     vs.                    Cancellation No. 92053314

8   Christian Faith Fellowship Church,

9        Respondent.

                                    /

10

11            The discovery deposition of

12  CRAIG MASON, taken in the above-entitled case, on the

13  4th day of April, 2014, at 9:53 o'clock a.m. at the

14  offices of Quarles & Brady, 300 North LaSalle Street,

15  Suite 4000, Chicago, Illinois, pursuant to agreement of

16  counsel.

17

18  Reported by:  Karyn H. Chalem, RPR, CSR

    License No.:  084-004167

19

20

21

22

23

24

```
                                                    Page 2
 1    A P P E A R A N C E S
 2           NOTARO, MICHALOS & ZACCARIA
             100 Dutch Hill Road
 3           Orangeburg, New York 10962
             BY:  ANGELO NOTARO
 4                JOHN ZACCARIA
             (845) 358-7700
 5           anotaro@notaromichalos.com
             jzaccaria@notaromichalos.com
 6                On behalf of the Petitioner;
 7           QUARLES & BRADY
             300 North LaSalle Street
 8           Suite 4000
             Chicago, Illinois  60654
 9           BY:  JOHN E. CONOUR
                  RICHARD YOUNG
10           (312) 715-5168
             john.conour@quarles.com
11                On behalf of the Respondent.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 12

1    the week or something, to buy a book, a CD or

2    whatever, or -- you know, out of the store.

3        Q.  Do I understand that there's separate staff

4    that work in the bookstore?

5        A.  We have a volunteer staff that primarily

6    works the bookstore.  And then we have the

7    administrative staff, that are paid staff of the

8    church, that has the rights to go in and make a sale

9    during the course of the week.

10       Q.  Is there a manager or an overseer of the

11   volunteers?

12       A.  Yes.  That's kind of changed from year -- you

13   know, over the years, but right now we do have a

14   manager.

15       Q.  Ms. Brown is not that manager, is she?

16       A.  She is not.

17       Q.  Okay.  Changing subjects a bit, Mr. Mason,

18   do you know if the church has parishioners that

19   attend services in Zion from out of state?

20       A.  Yes.

21       Q.  And how do you know that?

22       A.  Well, we have -- we are on the Wisconsin

23   border, so we have members that do attend from the

24   Wisconsin border, as well as Great Lakes naval

Page 13

1    training base is about five to seven miles from the

2    church, so there are a lot of naval personnel that

3    are residents around the area.

4       Q.  Do you know how many people attend from out

5    of state?

6       A.  We did a demographic last year -- well,

7    earlier this year from the numbers of the -- from

8    last year.  We have -- just from last year, we have

9    a little over 200 members of our congregation that

10   comes from out of state.  Well, just from Wisconsin

11   alone.

12      Q.  You said you did a demographic.  What is a

13   demographic?

14      A.  We did a demographic pie chart to find out,

15   by city in our region, to find out where people are

16   coming from based on the information we have in our

17   member database.

18      Q.  Why did you do that?

19      A.  We wanted to find out where people were

20   coming from so we could see if we need to start a

21   church planning in a certain region.

22      Q.  Do you know how long members -- I'm sorry,

23   parishioners have been attending your church from

24   out of state?

Page 14

1       A.  Well, personally I know some that may have --

2    that have been attending five years or more.

3       Q.  Was Add A Zero merchandise offered for sale

4    to these parishioners who attend from out of state?

5            MR. NOTARO:  Objection, leading, calls

6    for speculation.

7            MR. CONOUR:  You can answer --

8            MR. NOTARO:  No foundation.

9            MR. CONOUR:  -- if you understand the

10   question.

11           THE WITNESS:  Yes.  It's offered to

12   anyone that attends.  The bookstore's open when

13   they attend the church services.

14   BY MR. CONOUR:

15      Q.  Was Add A Zero merchandise offered to your

16   parishioners whether they attend from in state or

17   out of state in 2005?

18           MR. NOTARO:  Objection, no foundation.

19   BY MR. CONOUR:

20      Q.  You can answer if you can understand it.

21      A.  If they -- the product is available.  If they

22   go to the bookstore, the product is available for

23   them to purchase.

24      Q.  Was that also true in 2010?

Page 15

1    A.  Yes, that's correct.

2    Q.  Is it still true?

3    A.  Yes, that's correct.

4    Q.  Do you know if any parishioners from out of

5  state bought Add A Zero merchandise?

6    A.  Yes, we have had parishioners from out of

7  state to buy merchandise.

8         MR. CONOUR:  I'd like to introduce into

9  evidence --

10        MR. NOTARO:  Objection, lack of

11  foundation.

12        MR. CONOUR:  Please mark this as

13  Exhibit 2.  This is, I believe, Exhibit Number 7

14  from your deposition of Mr. Mason.

15        (Exhibit 2 marked.)

16  BY MR. CONOUR:

17    Q.  Mr. Mason, do you recognize this document?

18    A.  Yes, I do.

19    Q.  What is it?

20    A.  It is a receipt journal with item details

21  from our church bookstore database.

22    Q.  Can you determine if an out-of-state

23  parishioner bought Add A Zero merchandise from this

24  document?

Page 16

1      A.   No, not from this document alone.

2      Q.   Not from this document alone.  What else

3   would you need to do so?

4      A.   We would have --

5           MR. NOTARO:  Objection, lack of

6   foundation, no showing of personal knowledge.

7   BY MR. CONOUR:

8      Q.   You may answer.

9      A.   Okay.  I would have to take the sales date of

10  an item and reference the sales receipts that were

11  turned in to the accounting department to verify

12  whether it was a check, credit card or cash sale,

13  and then reference the sales.

14          MR. CONOUR:  I'd like to offer into

15  evidence Exhibit Number 3.  Would you please mark

16  that for -- as Exhibit Number 3.

17          Oh, I'm sorry, mark that Exhibit Number

18  3.

19          (Exhibit 3 marked.)

20          MR. NOTARO:  Okay.  We object to

21  Exhibit Number 3 on the grounds that it's

22  inadmissible hearsay.

23  BY MR. CONOUR:

24     Q.   Mr. Mason, do you recognize Exhibit Number

1    3?

2        A.  Yes, I do.

3        Q.  Was this a record maintained by you for the

4    church?

5        A.  Yes, it is.

6            MR. NOTARO:  Objection.  It does not

7    meet the business records exception rule.

8    BY MR. CONOUR:

9        Q.  Could you please describe what Exhibit 3 is?

10       A.  Exhibit 3 is a copy of a sales receipt from

11   the bookstore.

12       Q.  And how do you know that?

13       A.  I know that because it was attached to the --

14   the end-of-day sales report for the bookstore.

15       Q.  What does this show?  Could you describe,

16   for example --

17       A.  Sure.

18       Q.  -- do you know who this person is?

19       A.  Yes, I do know who the person is.

20       Q.  She is -- the name is Clementina Ekong.  Is

21   Ms. Ekong -- do you know if she's a member of your

22   church?

23       A.  Yes, Ms. Ekong is a member of the church.

24       Q.  There's -- do you know what this receipt is

Page 18

1    for?

2        A.    This receipt is for a purchase made in the

3    church bookstore.  If I referenced the sales date to

4    the receipt journal for January 30th, 2005, and turn

5    to page two of the receipt journal, the last item on

6    page two is for the exact amount of $51.12.

7        Q.    And that's the same amount that's on the

8    Exhibit 3?

9        A.    That's correct.

10        Q.    Do you know if Ms. Ekong is a resident of

11    Illinois?

12            MR. NOTARO:  Objection, lack of

13    personal knowledge, calls for speculation.

14    BY MR. CONOUR:

15        Q.    You may answer.

16        A.    I'm not sure if she's a resident -- you said

17    resident of Illinois, correct?

18        Q.    Uh-huh.

19        A.    I'm not sure if she's a resident of Illinois.

20    I do know that Ms. Ekong is in the military and that

21    she was a member of the church.  For a period of

22    time, she left and has returned last year as she was

23    re -- reassigned to Great Lakes naval base.

24        Q.    There's some writing here on this sheet, as

1    you can see, on the right-hand side that says

2    military, and then I'm not sure what the rest of it

3    says.

4         Do you know what that writing is or where it

5    came from?

6      A.  Yes.  That's writing notes that was made on

7    the document, on the copy, by my assistant as she

8    was doing -- gathering this information.

9             MR. NOTARO:  Objection, lack of

10   foundation, lack of personal knowledge.

11   BY MR. CONOUR:

12     Q.  Do you happen to know if this document was

13   redacted or in any way altered aside from this

14   additional writing?

15     A.  Not to my knowledge.

16            MR. NOTARO:  We also object to this

17   document as it was produced after the close of

18   discovery and a written objection has been made and

19   we maintain that objection.

20            MR. CONOUR:  Please mark as Exhibit

21   Number 4 this document.

22            (Exhibit 4 marked.)

23            MR. NOTARO:  We object to Exhibit

24   Number 4 on the grounds that it was not produced

Page 20

1    until after discovery, although it was called for

2    during our discovery request.  And we object to it

3    on the grounds of hearsay and on the grounds that

4    it is not a business record.

5                    MR. CONOUR:  Exhibit Number 4 has

6    CFFC0159 as the Bates number on there.

7                    And I'd also like to say for the record

8    that Exhibit Number 3 is CFFC0158, Bates label.

9    BY MR. CONOUR:

10    Q.  Mr. Mason, do you recognize Exhibit Number

11    4?

12    A.  Yes.

13    Q.  Could you please describe what it is?

14    A.  Exhibit Number 4 is a photocopy of checks

15    that were received in the bookstore sales from --

16    from purchases.

17    Q.  Were these records maintained by you from

18    the church?

19    A.  Yes, it was.

20    Q.  Were they maintained in this state?

21    A.  Not in this exact state.

22    Q.  How do they differ?

23    A.  These photocopies were all just so that the

24    account and routing numbers, banking information,

Page 21

1    would not show.

2       Q.   Do they differ in any other way?

3       A.   They do not differ in any other way.

4       Q.   What do these checks show?

5            MR. NOTARO:  Objection.  Witness does

6    not have personal knowledge, lack of foundation.

7    BY MR. CONOUR:

8       Q.   You may answer.

9            MR. NOTARO:  Calls for speculation,

10   hearsay.

11   BY MR. CONOUR:

12      Q.   Would you please describe what these checks

13   show.

14      A.   Sure.  These checks show that they were

15   written to Christian Faith Fellowship Church, and in

16   the memo of some of the checks, two out of the three

17   checks, it shows for T-shirts.  One actually says

18   T-shirts, bookstore.  And on the side marking of the

19   original, you can see where "bookstore" was written

20   in on the form that was turned in for the day's

21   sales, or the copies of the checks.

22      Q.   These are -- there are three different

23   individuals that wrote checks or are they all from

24   the same person?

1      A.   Three different individuals wrote the checks.

2      Q.   Do the checks indicate where these

3   individuals have a residence?

4             MR. NOTARO:  Objection, calls for

5   hearsay, lack of foundation, lack of personal

6   knowledge.

7             THE WITNESS:  The address on the checks

8   state Kenosha, Wisconsin, for all three check

9   writers.

10  BY MR. CONOUR:

11     Q.   Would you please indicate who the writers of

12  the checks were?

13            MR. NOTARO:  Objection, calls for

14  speculation, lack of personal knowledge, lack of

15  foundation.

16  BY MR. CONOUR:

17     Q.   Would you please read what the checks say as

18  to who they supposedly belong to?

19     A.   The first one is Irene Washington, 6019 -- I

20  can't read the street, but Apartment 1, Kenosha,

21  Wisconsin, 53142-3567.

22       Second check, Kevin C. Venard, Willie B.

23  Venard.  Address is a little obscured, but it's

24  3906 -- can't read -- it looks like 80th Street,

Page 23

1   Apartment 12, Kenosha, Wisconsin, 53142.

2        The third check, from Charlotte Howard, 1544

3   17th Avenue, Kenosha, Wisconsin, 53140.

4        Q.  Do you believe these checks were written at

5   the bookstore?

6        A.  That is correct.

7        Q.  Why do you believe that?

8        A.  Because the check copies came from the

9   records that were from bookstore sales.

10       Q.  And do you keep records for bookstore sales?

11       A.  Yes, we do.

12       Q.  Is that something that you're in charge of?

13       A.  Yes.  I store them in my -- in my storeroom.

14       Q.  So you keep records for all sales of the

15   bookstore?

16       A.  Yes, I do.

17            MR. NOTARO:  Objection, leading.

18   BY MR. CONOUR:

19       Q.  If you wanted to find out -- if you thought

20   these checks were purchases made in the bookstore

21   and they were for Add A Zero, how would you find

22   them on the sales receipt?

23            MR. NOTARO:  Objection, leading.

24            THE WITNESS:  The way that I can prove

Page 24

1    that these checks were from bookstore sales is from

2    this receipt journal item.  It shows the sale

3    amount and a date.

4              I can also take that day to go to the

5    sales closeout report, or Z report as it's known

6    as, to show that the check numbers coincide with

7    that date and that sales report at the end of the

8    day, because the sales report also records check

9    numbers or whether it was a Visa, MasterCard or

10   what type of credit card was utilized.

11   BY MR. CONOUR:

12      Q.  Mr. Mason, referring back to Exhibit 3,

13   which is the credit card receipt, why was this not

14   produced earlier?

15      A.  To my knowledge, it wasn't -- it wasn't

16   requested.

17      Q.  Same question with respect to Exhibit Number

18   4.  Why were these checks not produced earlier?

19      A.  To my knowledge, again, I don't believe that

20   they were requested originally.

21      Q.  Okay.  We may have covered this and I

22   apologize if we have.  Were these documents changed

23   in any way -- I think we did cover that.  Never

24   mind.  Please strike that.

Page 27

1    he's under -- he's under oath, he's in testimony,

2    he's not to be discussing the -- this deposition

3    with anyone during the break.

4               MR. CONOUR:  Right.  If you'd like some

5    more coffee or to use the restroom, you may.

6               THE WITNESS:  Thank you.

7               (Recess taken from 10:22 to 10:28.)

8               MR. CONOUR:  Mr. Mason, I'd like to

9    remind you you're still under oath.  I just have a

10   couple more questions.

11   BY MR. CONOUR:

12      Q.  Going back to the discussion of parishioners

13   that attend from out of state, and in particular

14   those from Wisconsin, do you know if these

15   parishioners are recent or current attendees?

16               MR. NOTARO:  Objection, vague.

17   BY MR. CONOUR:

18      Q.  You can answer if you understand it.

19      A.  Which parishioners are we --

20      Q.  I'm sorry, those that attend from Wisconsin.

21               MR. NOTARO:  Objection, vague, leading.

22               THE WITNESS:  From the demographic

23   report that we discussed earlier -- earlier in the

24   deposition, that was from 2013 data.  I do know

Page 28

1   that those -- some of those members are currently

2   still attending the church service.  Actually, I

3   workout with one of the gentleman that live in

4   Wisconsin.

5   BY MR. CONOUR:

6     Q.  One last question.  Based on your review of

7   the bookstore records, were there any sales of add

8   a zero merchandise -- do you know if there were any

9   sales of add a zero merchandise to residents who

10  live outside of Illinois before March 23rd, 2005?

11            MR. NOTARO:  Can I hear the question

12  back, please.

13            (Requested question read back.)

14            MR. NOTARO:  Objection, leading, lack

15  of foundation, calls for speculation.

16            THE WITNESS:  Based on the check copies

17  that was in Exhibit 4 that was presented, there was

18  a sale on 2-23-2005, is the check date.

19  BY MR. CONOUR:

20    Q.  Are you aware of any others?

21    A.  Yes.  Credit card sales slip of a purchase by

22  Clementina Ekong on 1-30-2005.

23            MR. CONOUR:  I have no further

24  questions.

Page 30

1    Q.  Yes.  And you testified that the number of
2  members numbered from 1200 to 1500 members,
3  correct?
4    A.  Yes, I believe that's correct.
5    Q.  You referred to the Great Lakes naval
6  training base in your testimony in chief, correct?
7  In your testimony this morning, you referred to the
8  Great Lakes naval training base?
9    A.  That's correct.
10    Q.  And it's located in Illinois, correct?
11    A.  Yes, it is.
12    Q.  How far from the border of Wisconsin is
13  the -- the premises of the church?
14    A.  Not sure in -- as far as miles, but time
15  driving, you can be in Wisconsin in five to ten
16  minutes, depending on which direction you go.
17    Q.  The picnic that is the subject matter of the
18  photos in Exhibit 5, that picnic took place in
19  Shiloh Park, correct?
20    A.  That is correct.  The banner states that it
21  was at Shiloh Park.
22    Q.  Do you know if the picnic took place in
23  Shiloh Park?
24    A.  Yes, it did take place in Shiloh Park.

# Christian Faith Fellowship Church Bookstore
## Receipt Journal with Item Detail
### Date: 1/1/2005 to 7/22/2011



CFFC0001

| Rcpt# | Date | Associate | | | Rcpt Tax | Rcpt Total | Qty | | |
|---|---|---|---|---|---|---|---|---|---|
| 01290 | 1/9/2005 | | Yolanda | | 1.17 | 19.17 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |
| 01296 | 1/9/2005 | | Yolanda | | 10.21 | 167.21 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 4.00 | 18.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 2.00 | 30.00 | 0.00 |
| 000489 | 61 | = | Add-a-Zero Crew | | | | 1.00 | 25.00 | 0.00 |
| 01297 | 1/9/2005 | | Yolanda | | 3.25 | 53.25 | | | |
| 000412 | 81 | ANC | Best Is Yet To Come DVD | | | | 1.00 | 20.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 1.00 | 30.00 | 0.00 |
| 01309 | 1/12/2005 | | ELAINE | | 5.07 | 83.07 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 1.00 | 30.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 1.00 | 30.00 | 0.00 |
| 01310 | 1/13/2005 | | ELAINE | | 2.80 | 45.80 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |
| 000489 | 61 | = | Add-a-Zero Crew | | | | 1.00 | 25.00 | 0.00 |
| 01311 | 1/13/2005 | | Heather | | 9.49 | 155.49 | | | |
| 000489 | 61 | = | Add-a-Zero Crew | | | | 2.00 | 25.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 2.00 | 30.00 | 0.00 |
| 000488 | 61 | = | Add-a-zero Caps | | | | 2.00 | 18.00 | 0.00 |
| 01312 | 1/13/2005 | | Heather | | 7.41 | 121.41 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 3.00 | 18.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 2.00 | 30.00 | 0.00 |
| 01314 | 1/13/2005 | | Heather | | 3.12 | 51.12 | | | |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 1.00 | 30.00 | 0.00 |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |
| 01315 | 1/13/2005 | | Heather | | 3.90 | 63.90 | | | |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 2.00 | 30.00 | 0.00 |
| 01319 | 1/23/2005 | | mason | | 4.75 | 77.75 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |
| 000489 | 61 | = | Add-a-Zero Crew | | | | 1.00 | 25.00 | 0.00 |
| 000490 | 61 | = | Add-a-Zero Hooded | | | | 1.00 | 30.00 | 0.00 |
| 01320 | 1/23/2005 | | mason | | 1.17 | 19.17 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |
| 01321 | 1/23/2005 | | mason | | 5.07 | 83.07 | | | |
| 000488 | 61 | = | Add-a-zero Caps | | | | 1.00 | 18.00 | 0.00 |

07/29/11 1:30 PM

## Receipt Journal with Item Detail

| Rcpt# | Date | | Associate | Rcpt Tax | Rcpt Total | | | |
|---|---|---|---|---|---|---|---|---|
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| 01324 | 1/23/2005 | | Heather | 1.95 | 31.95 | | | |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| 01326 | 1/23/2005 | | Heather | 1.17 | 19.17 | | | |
| | 000488 | 61 | II  Add-a -zero Caps | | | 1.00 | 18.00 | 0.00 |
| 01328 | 1/30/2005 | | mason | 4.75 | 77.75 | | | |
| | 000488 | 61 | II  Add-a-zero Caps | | | 1.00 | 18.00 | 0.00 |
| | 000489 | 61 | II  Add-a-zero Crew | | | 1.00 | 25.00 | 0.00 |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| 01331 | 1/30/2005 | | mason | 4.29 | 70.28 | | | |
| | 000077 | 11 | KCP  Year Mashida Stole Chtstm | 189pp | | 1.00 | 5.99 | 0.00 |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| 01336 | 1/30/2005 | | ELAINE | 1.17 | 19.17 | | | |
| | 000488 | 61 | II  Add-a -zero Caps | | | 1.00 | 18.00 | 0.00 |
| 01344 | 1/30/2005 | | ELAINE | 1.92 | 31.52 | | | |
| | 000488 | 61 | II  Add-a -zero Caps | | | 1.00 | 18.00 | 0.00 |
| | 000478 | 101 | IH  Sour Strawa Strawberry | | | 1.00 | 0.61 | 0.00 |
| | 000421 | 11 | ANC  Christ The Healer | | | 1.00 | 10.99 | 0.00 |
| 01345 | 1/30/2005 | | ELAINE | 1.63 | 26.63 | | | |
| | 000489 | 61 | II  Add-a-Zero Crew | | | 1.00 | 25.00 | 0.00 |
| 01346 | 1/30/2005 | | ELAINE | 1.17 | 19.17 | | | |
| | 000488 | 61 | II  Add-a -zero Caps | | | 1.00 | 18.00 | 0.00 |
| 01347 | 1/30/2005 | | ELAINE | 1.63 | 26.63 | | | |
| | 000489 | 61 | II  Add-a-Zero Crew | | | 1.00 | 25.00 | 0.00 |
| 01351 | 1/30/2005 | | ELAINE | 1.95 | 31.95 | | | |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| 01353 | 1/30/2005 | | ELAINE | 5.07 | 83.07 | | | |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |
| | 000488 | 61 | II  Add-a -zero Caps | | | 1.00 | 18.00 | 0.00 |
| 01354 | 1/30/2005 | | ELAINE | 2.80 | 45.80 | | | |
| | 000489 | 61 | II  Add-a-Zero Crew | | | 1.00 | 25.00 | 0.00 |
| | 000488 | 61 | II  Add-a-Zero Caps | | | 1.00 | 18.00 | 0.00 |
| 01355 | 1/30/2005 | | ELAINE | 3.12 | 51.12 | | | |
| | 000490 | 61 | II  Add-a-Zero Hooded | | | 1.00 | 30.00 | 0.00 |

CFFC0002

**APP 64**

07/29/11 1:30 PM

Receipt Journal with Item Detail

| Rcpt# | Date | Acct | Assoc | Code | Item | Qty | Amount | | Rcpt Tax | Rcpt T Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 01363 | 2/2/2005 | 000488  61 | Yolanda | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.63 | 28.63 |
| 01364 | 2/2/2005 | 000489  61 | Yolanda | II | Add-a-Zero Crew | 1.00 | 25.00 | 0.00 | 1.63 | 28.63 |
| 01375 | 2/4/2005 | 000490  61 | dificzion | II | Add-a-Zero Hooded | 1.00 | 30.00 | 0.00 | 1.95 | 31.95 |
| 01616 | 2/20/2005 | 000488  61 | Heather | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.20 | 19.67 |
| | | 000443  101 | | IH | Candy Bars | 1.00 | 0.47 | 0.00 | | |
| 01619 | 2/20/2005 | 000488  61 | Heather | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.17 | 19.17 |
| 01620 | 2/20/2005 | 000493  11 | Heather | IPG | Fathering Spirit, The | 2.00 | 15.00 | 0.00 | 3.96 | 64.90 |
| | | 000490  61 | | II | Add-a-Zero Hooded | 1.00 | 30.00 | 0.00 | | |
| | | 000443  101 | | IH | Candy Bars | 2.00 | 0.47 | 0.00 | | |
| 01625 | 2/23/2005 | 000488  61 | ELAINE | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 2.34 | 38.34 |
| | | 000488  61 | | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | | |
| 01626 | 2/23/2005 | 000488  61 | ELAINE | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.17 | 19.17 |
| 01627 | 2/23/2005 | 000490  61 | ELAINE | II | Add-a-Zero Hooded | 1.00 | 30.00 | 0.00 | 4.55 | 74.55 |
| | | 000489  61 | | II | Add-a-Zero Crew | 1.00 | 25.00 | 0.00 | | |
| | | 000493  11 | | IPG | Fathering Spirit, The | 1.00 | 15.00 | 0.00 | | |
| 01628 | 2/27/2005 | 000488  61 | mason | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.17 | 19.17 |
| 01629 | 2/27/2005 | 000488  61 | mason | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.17 | 19.17 |
| 01630 | 2/27/2005 | 000490  61 | Kathryn | II | Add-a-Zero Hooded | 1.00 | 30.00 | 0.00 | 1.95 | 31.95 |
| 01638 | 2/27/2005 | 000488  61 | Heather | II | Add-a-zero Caps | 1.00 | 18.00 | 0.00 | 1.20 | 19.67 |
| | | 000443  101 | | IH | Candy Bars | 1.00 | 0.47 | 0.00 | | |
| 01639 | 3/2/2005 | 000493  11 | ELAINE | IPG | Fathering Spirit, The | 1.00 | 15.00 | 0.00 | 2.93 | 47.93 |

APP 65



CFFC0159

12:26 PM
07/29/11
Accrual Basis

Christian Faith Fellowship Church
Add A Zero QBooks Report
All Transactions

| Type | Date | Num | Name | Memo | Account | Amount | Balance |
|------|------|-----|------|------|---------|--------|---------|
| Check | 7/21/2005 | 8140 | Icon Industries | order for Add A Zero t-shirts & caps. Purple- apparel for bookstore sai... | 50001 · Other Mer... | 1,648.75 | 1,648.75 |
| Check | 5/5/2005 | 7917 | Icon Industries | Reorder for Add A Zero apparel for bookstore sales | 50001 · Other Mer... | 687.84 | 2,336.59 |
| Check | 3/4/2005 | 7761 | Icon Industries | Reorder for Add A Zero apparel for bookstore sales | 50001 · Other Mer... | 620.32 | 2,956.91 |
| Check | 1/7/2005 | 7632 | Icon Industries | Add A Zero cap and shirt order final payment | 50001 · Other Mer... | 516.00 | 3,472.91 |
| Check | 12/9/2004 | 7581 | Icon Industries | Add A Zero cap and shirt order 1/2 down payment | 50001 · Other Mer... | 516.00 | 3,988.91 |
| Check | 10/28/2004 | 7471 | Icon Industries | Add A Zero cap and shirt design samples | 50001 · Other Mer... | 178.90 | 4,167.81 |
| Total | | | | | | 4,167.81 | 4,167.81 |



Deponent
Date

A π EXHIBIT 2
WWW.DEPOBOOK.COM